In re TORWICO ELECTRONICS, INC., Debtor.

TORWICO ELECTRONICS, INC., Plaintiff,

v.

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, Defendant.

Bankruptcy No. 87–06071.
Adv. No. 90–3116 TS.

United States Bankruptcy Court, D. New Jersey.

Sept. 6, 1991.

As Amended Sept. 27, 1991.

David E. Shaver, Bathgate, Wegener, Wouters & Neumann, Lakewood, N.J., for plaintiff

Rachel Jeanne Lehr, Office of Atty. Gen. of N.J., Trenton, for defendant.

## MEMORANDUM OPINION

STEPHEN A. STRIPP, Bankruptcy Judge.

This is an opinion on a motion and cross-motion for summary judgment in this adversary proceeding. The Debtor applies for a declaratory judgment that any obligation which it may have to the State of New Jersey under environmental laws to clean up contamination at the Debtor's former place of business is an unsecured claim under title 11, United States Code (the Bankruptcy Code), and that the State is now barred from collecting because of failure to file a proof of claim within the time required by the Bankruptcy Rules. The Debtor also applies for an injunction permanently restraining defendant State of New Jersey, Department of Environmental

Protection ("the DEP") from seeking to enforce such claims in any judicial or administrative proceeding. The DEP applies for a declaratory judgment that the Debtor's obligations to the State are not claims, and in the alternative, that any such claims are not time-barred. This court has jurisdiction under 28 U.S.C. §§ 1334(a) and 151. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O). This shall constitute the court's findings of fact and conclusions of law.

## I.

### FINDINGS OF FACT

The material facts are undisputed. The Debtor is in the business of manufacturing electronic transformers. Its present place of business is 410 Oberlin Avenue, Lakewood, New Jersey. However, until September, 1985 the Debtor's place of business was located at the corner of New Jersey Route 70 and New Hampshire Avenue in Lakewood ("the property"). The Debtor never owned this property, but, in fact, leased the property from the present owner, George Allen Associates ("GAA"). The Debtor's lease terminated and it moved from the property as of September 3, 1985. The Debtor has not had possession of or control over the property since then.

At some point after the Debtor moved from the property, the Debtor and GAA entered into an agreement to share certain ECRA related costs.[1] The Debtor and GAA took certain steps to clean up contamination on the property.[2] A dispute then arose over a waste solvent seepage pit which GAA discovered during its cleanup. This pit was an illegal facility.[3] Torwico denies that it ever used the seepage pit and that it was even aware of its existence.[4]

---

1. Certification of Robert Savino, President of the Debtor, dated November 20, 1990, ¶ 3.

2. Affidavit of Michael J. McCann, DEP Case Manager, filed March 8, 1991.

3. *Id.,* ¶ 29.

4. Savino Certification, *supra.* Although it is not part of the record in this adversary proceeding, it is part of the record in the Debtor's bankruptcy case that in October, 1986 GAA filed suit against the Debtor in the Superior Court of New Jersey for damages arising from alleged breach of lease provisions requiring the Debtor to comply with ECRA. The Debtor filed an answer denying liability, a counterclaim, and a third-party complaint. The third-party defendant, in turn, filed fourth-party complaints. The DEP is not a party to that case. After the Debtor filed its bankruptcy petition it removed the state court case to this court. However, this court later remanded the case to the state court. This

Remediation of soil contamination was completed to the DEP's satisfaction. However, there is extensive ground water contamination which apparently originated from the seepage pit and which has migrated off the property. The DEP believes that the ground water contamination poses a potential threat to public health.

On August 4, 1989, the Debtor filed a petition for reorganization under chapter 11 of the Bankruptcy Code. It remains a debtor in possession. It scheduled the DEP and the Attorney General of New Jersey on Schedule A–3, which is for unsecured creditors, as holding disputed claims against the Debtor.[5] On October 4, 1989 the court issued an Order for Meeting of Creditors, Combined with Notice Thereof and of Automatic Stay, which is a standard order issued in every bankruptcy case. The order issued in the Debtor's case stated in pertinent part as follows:

ANY CREDITOR OR EQUITY SECURITY HOLDER WHOSE CLAIM OR INTEREST IS NOT SCHEDULED OR SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED SHALL FILE A PROOF OF CLAIM OR INTEREST ON OR BEFORE JANUARY 2, 1990 OR UNLESS OTHERWISE MODIFIED BY THE COURT.

This order was mailed by the court to each scheduled creditor. It stated whether each creditor's claim was scheduled as disputed, and each creditor was thereby informed as to whether it was necessary to file a proof of claim. Such filing is necessary to preserve the creditor's right to receive payment in the case; if a proof of claim is timely filed, a hearing is eventually scheduled to adjudicate the debtor's objection to such claim. Copies of the order in question were served by mail upon the Attorney General of the State of New Jersey and upon the DEP on October 4, 1989. The orders were mailed to the correct address-

es, and were not returned as undelivered. The Attorney General and the DEP, however, deny that they were served with the order, stating that neither of them has any record of it.

The summons and complaint commencing this adversary proceeding were served upon the DEP on or about April 2, 1990. On April 9, 1990 the DEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment to the Debtor ("the Administrative Order").[6] In substance, it determines that the Debtor disposed of hazardous wastes in the seepage pit in violation of the Solid Waste Management Act, N.J.S.A. 13:1E–1 *et seq.* and regulations thereunder. The Administrative Order directs the Debtor to submit a written plan to the DEP for closure of the seepage pit within fifteen days. It also assesses a civil administrative penalty of $22,500 against the Debtor, and states that payment is due when the Order becomes final. It also states that the Order is binding upon any bankruptcy trustee, and that

No obligations imposed by this Administrative Order and Notice of Civil Administrative Penalty Assessment (with the exception of [the $22,500 penalty]) are intended to constitute a debt, damage, claim, penalty or other civil action, which should be limited or discharged in a bankruptcy proceeding. All obligations are imposed pursuant to the police powers of the State of New Jersey, intended to protect the public health, safety, welfare, and environment.

II.

STANDARDS GOVERNING SUMMARY JUDGMENT

These motions are governed procedurally by Bankruptcy Rule 7056, which incorporates by reference Rule 56 of the Federal Rules of Civil Procedure, dealing with summary judgment. Summary judgment is ap-

court has not been informed that there has been any adjudication yet in that case of the question of liability as between the Debtor and GAA for environmental cleanup costs. Since GAA is not a party to this adversary proceeding, the judgment to be entered herein is presumptively not binding upon it.

5. Bankruptcy Rule 1007(b)(1) requires a debtor to file schedules of its assets and liabilities on certain official forms.

6. *See* Exhibit D to Savino Certification, *supra.*

propriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court stated that:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1.

A party opposing a motion for summary judgment must

> ... do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'

*Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

As the cross-motions for summary judgment reflect, the parties agree that there are no genuine issues of material facts, *i.e.* facts which are essential to the determination of this action. The material facts are as stated in Section I above, and the disputes are as to issues of law.

### III.

BEFORE FUNDS ARE EXPENDED BY A BANKRUPTCY ESTATE FOR ANY REASON, A DETERMINATION MUST BE MADE THAT THE EXPENDITURE IS AUTHORIZED UNDER THE CLASSIFICATION AND DISTRIBUTION PROVISIONS OF THE BANKRUPTCY CODE.

To place the issues which follow in their proper context, it is first necessary to briefly consider certain fundamental aspects of bankruptcy law.

The filing of a bankruptcy petition creates an estate which consists of substantially all legal and equitable interests of the debtor in property as of the commencement of the case. Code § 541. The Bankruptcy Code includes a system of provisions for classification of claims against the debtor's property, determination of priorities, and conditions to payment. Although there is a great variety of obligations under nonbankruptcy law requiring payment of money, the Bankruptcy Code provides that all such obligations must be classified within a small handful of categories. This system of classification is an integral part of bankruptcy law, because in the vast majority of bankruptcy cases, there are insufficient assets to satisfy all claims against the debtor in full. Because this creates competition for a debtor's assets, the Bankruptcy Code also includes a system of priorities.

There are only five basic categories of claims in the Bankruptcy Code against a debtor's assets. In order of priority, those categories are as follows:

1. *Secured claims.* These are claims secured by liens on a debtor's assets. A lien is essentially a right to resort to a particular asset for payment before any other creditor can resort to it. Under Bankruptcy Code § 506, a claim is secured to the extent of the value of the collateral, and unsecured to the extent of any deficiency. Security interests, which essentially consist of contractual liens on real or personal property, are the most common form of lien. A security interest is property which is protected by the Takings Clause of the Fifth Amendment to the United States Constitution, which provides that no private property shall be taken for public use without just compensation. *United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). Secured claims therefore have the highest level of priority in bankruptcy cases. Code § 361 and other sections are designed to prevent involuntary reduction in value of secured claims, which would violate the Takings Clause.

2. *Administrative expenses.* These are the actual, necessary costs and expenses of preserving the bankruptcy estate, and related expenses. Code § 503(b). After secured claims, administrative ex-

penses have the second highest level of priority. Code § 507(a)(1). That essentially reflects the practical reality that if bankruptcy estates are to be administered, those who render such services require assurance that they will meet a better fate than other creditors of the debtor (although it often happens that administrative expenses also are not paid in full.)

■ 3. *Priority claims.* Administrative expenses are a type of "priority" claim. Code § 507(a)(1). The term "priority claim", however, is generally used in this State as a term of art to refer to all of the types of claims defined in Code § 507(a)(2) through (8) which, for policy reasons, Congress has determined shall receive preferred treatment in distributions of a debtor's property. Tax claims generally fall under Code § 507(a)(7) (although they may also be secured claims under applicable nonbankruptcy law, or administrative expenses if they arise postpetition). Claims based upon commitments to the Federal Deposit Insurance Corporation, Resolution Trust Corporation and related entities to maintain the capital of an insured depository institution fall under Code § 507(a)(8). *These are the only types of obligations of a debtor to governmental units which are given priority by the Bankruptcy Code.*

4. *Unsecured claims.* These are all other legal obligations of the debtor requiring payment of money. Code § 101(5). The Bankruptcy Code generally defers to nonbankruptcy law to determine the creation of legal obligations which give rise to claims. *In re Meyertech,* 831 F.2d 410, 417 (3d Cir.1987). Code § 502(b), however, does limit certain types of claims.

5. *Equity interests.* These are essentially the ownership interests, primarily those reflected in capital stock in the case of a corporate debtor. Code § 101(16).

Code § 1129 in chapter 11 cases and Code § 726 in chapter 7 cases require that all distributions of money or other property from a bankruptcy estate must follow this order of priority (except to the extent that a particular class consents to different treatment under a chapter 11 plan).

■ Two fundamental conclusions follow from the Bankruptcy Code provisions dealing with classification of obligations and distribution of property of the estate. First, *every type of obligation requiring payment of money from a bankruptcy estate falls within one of the foregoing five categories; the Bankruptcy Code recognizes no other categories* (except for co-ownership interests of third parties). Second, *where there is a dispute about whether money should be paid from a bankruptcy estate to satisfy a legal obligation, the first phase of the analysis must be to determine the category to which the obligation belongs.* With this background, we can proceed to determine the nature of the debtor's obligation to clean up its former property under the Bankruptcy Code, and the treatment to which it is entitled in this case.

## IV.

## THE DEBTOR'S CLEANUP OBLIGATION TO THE STATE IS AN UNSECURED CLAIM.

The DEP issued its Administrative Order under the Solid Waste Management Act, N.J.S.A. 13:1E–1 *et seq.* ("the Solid Waste Act"), and regulations thereunder. Moreover, the DEP also alleges that the Debtor violated three other New Jersey environmental laws by the wrongful discharge of hazardous substances on the property: the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K–6 *et seq.* ("ECRA"); the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11 *et seq.* ("the Spill Act"); and the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1 *et seq.* ("the Water Pollution Act"). The Debtor denies that it violated any of those laws. However, for purposes of these motions for summary judgment the Debtor argues essentially that even if it did violate those laws, any resulting obligations it may have to the State of New Jersey are debts which are dischargeable in bankruptcy. The DEP argues that such obligations are not debts, but rather are "regulatory obligations" which are not dischargeable. The

first question then is as to the definitions of the terms "debt" and "claim" under the Bankruptcy Code.

Code § 101(5) states that

"claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Code § 101(12) defines "debt" as "liability on a claim." Under Code § 101(10)(A), the term "creditor" means an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." [7] The legislative history expresses Congressional intent that "the terms debt and claim are coextensive: a creditor has a claim against the debtor; the debtor owes a debt to the creditor." S.Rep. No. 95–989, 95th Cong., 2nd Sess. 23 (1978); H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 310, U.S.Code Cong. & Admin.News 1978, 6267 (1977). Congress intended that these terms should be defined very broadly:

By this broadest possible definition [of the term "claim"], and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 21–22 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309, U.S.Code Cong. & Admin.News 1978, 6266 (1977).

In three recent cases, the United States Supreme Court has held that the term "claim" is to be defined as broadly as Congress intended. In *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), the Supreme Court held that restitution obligations imposed as conditions of probation in state criminal actions are "debts" which are dischargeable under chapter 13 of the Bankruptcy Code. In so doing, the Court held that the fact that restitution orders are imposed for the benefit of the state as well as the victims makes no difference as to whether such obligations are "claims" in bankruptcy:

But the language employed to define "claim" in § 101(4)(A) makes no reference to purpose. The plain meaning of "right to payment" is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation.

110 S.Ct. at 2131.

The Supreme Court reaffirmed this holding this year in *Johnson v. Home State Bank,* —— U.S. ——, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). The issue in *Johnson* was whether a debtor can include a mortgage lien in a chapter 13 bankruptcy reorganization plan once the personal obligation secured by the mortgaged property has been discharged in a chapter 7 proceeding. The Court held that in such a circumstance the mortgage lien remains a "claim" against the debtor that can be rescheduled under chapter 13. Code § 524(a)(1) provides that a bankruptcy discharge extinguishes "the personal liability of the debtor with respect to any debt," and the defendant argued that after such discharge, the obligation secured by the remaining lien was no longer a "debt." The Court noted that Code § 102(2) establishes as a rule of construction that the phrase " 'claim against the debtor' includes claim against property of the debtor." Hence, the fact that the defendant could still look to the debtor's real property as a source of pay-

---

**7.** Code § 301 provides that in a voluntary bankruptcy case, the filing of the bankruptcy petition constitutes an order for relief under the chapter of the Bankruptcy Code under which the petition was filed.

ment meant that the defendant still had a "claim" against the debtor.

In both *Johnson* and *Davenport*, the Supreme Court relied on its holding in *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In *Kovacs*, the State of Ohio obtained an injunction ordering William Kovacs to clean up a hazardous waste site. A receiver was subsequently appointed. Then Kovacs filed a bankruptcy petition. The Supreme Court stated that "[t]he question before us is whether in the circumstances present here, Kovacs' obligation under the injunction is a 'debt' or 'liability on a claim' subject to discharge under the Bankruptcy Code." *Id.* at 275, 105 S.Ct. at 706.

Kovacs was an officer and stockholder of a corporation which caused pollution in Ohio. The State obtained a consent judgment which required the corporation and Kovacs to cease polluting, to clean up the property, and to pay the State $75,000 in damages. When there was no compliance, Ohio appointed a receiver for Kovacs' assets to implement the judgment. When Kovacs filed a bankruptcy petition, Ohio sought a declaratory judgment that Kovacs' obligation under the injunction requiring cleanup was not a "debt." In a unanimous opinion, the Supreme Court held as follows:

> The State resorted to the courts to enforce its environmental laws against Kovacs and secured a negative order to cease polluting, an affirmative order to clean up the site, and an order to pay a sum of money to recompense the State for damage done to the fish population. Each order was one to remedy an alleged breach of Ohio law; and if Kovacs' obligation to pay $75,000 to the state is dischargeable in bankruptcy, which the State freely concedes, *it makes little sense to assert that because the cleanup order was entered to remedy a statutory violation, it cannot likewise constitute a claim for bankruptcy purposes. Id.* at 279, 105 S.Ct. at 708 [emphasis added].

**8.** DEP's brief dated December 6, 1990, page 12.

The Court therefore held that the obligation of the debtor under the cleanup order was a "claim" which was dischargeable in bankruptcy.

In all three of these cases, the Supreme Court has held in no uncertain terms that any enforceable obligation to pay money is a "claim" of the obligee and a "debt" of the obligor under Code §§ 101(5) and (12), which can be discharged in bankruptcy. Moreover, the unanimous opinion of the Court in *Kovacs* is directly on point. In *Kovacs*, as in this case, the State was seeking to compel the debtor to pay money to clean up environmental contamination. In *Kovacs*, as in this case, there was no suggestion by the State that the debtor was personally capable of cleaning up the environmental damage which he may have caused. "In reality, the only type of performance in which Ohio is now interested is a money payment to effectuate the Chem–Dyne cleanup." *Id.* at 282, 105 S.Ct. at 709.

The DEP argues that *Kovacs* is not controlling. It states that the *Kovacs* decision "is a very narrow one involving a money judgment and a chapter 7 individual debtor who had already been replaced with a receiver, by the state" before he filed his bankruptcy petition.[8] There is nothing in *Kovacs*, however, which suggests that its analysis of the terms "claim" and "debt" should be limited to chapter 7 cases or to cases involving individuals. Furthermore, Code § 103(a) provides that chapter 1, which includes the definitions of "debt" and "claim" in Code § 101, applies in all cases under chapters 7, 11, 12 and 13.

It is true that the appointment of a receiver was relevant in *Kovacs*. Accordingly, the Court declined to "address what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed...." *Id.* at 284, 105 S.Ct. at 710. Consequently, the opinion is not entirely clear as to what the Court would have held if there had not been a receiver. Certain inferences, however, can be drawn from a close reading. The Court noted that William Kovacs was not the

only person whose assets were placed in receivership:

> William Kovacs was the chief executive officer and stockholder of Chem–Dyne Corp., which with other business entities operated an industrial and hazardous waste disposal site in Hamilton, Ohio. In 1976, the State sued Kovacs and the business entities in state court for polluting public waters, maintaining a nuisance, and causing fish kills, all in violation of state environmental laws. In 1979, both in his individual capacity and on behalf of Chem–Dyne, Kovacs signed a stipulation and judgment entry settling the lawsuit. Among other things, the stipulation enjoined the defendants from causing further pollution of the air or public waters, forbade bringing additional industrial wastes onto the site, required the defendants to remove specified wastes from the property, and ordered the payment of $75,000 to compensate the State for injury to wildlife.
>
> Kovacs and the other defendants failed to comply with their obligations under the injunction. The State then obtained the appointment in state court of a receiver, who was directed to take possession of all property and other assets of Kovacs and the corporate defendants and to implement the judgment entry by cleaning up the Chem–Dyne site. The receiver took possession of the site but had not completed his tasks when Kovacs filed a personal bankruptcy petition.

Id. at 276, 105 S.Ct. at 706 [emphasis added]. Thus, it was significant that Chem–Dyne and other business entities operated the site in question, that the injunction required all of the defendants to clean up the site, and that the receiver took possession of all assets of Kovacs and the corporate defendants, including the site. The Supreme Court analyzed the effect that this had on any ability which Kovacs may otherwise have had to effect the cleanup:

> ... the State secured the appointment of a receiver, who was ordered to take possession of all of Kovacs' nonexempt assets as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs. As wise as this course may have been, it dispossessed Kovacs, removed his authority over the site, and divested him of assets that might have been used by him to clean up the property. Furthermore, when the bankruptcy trustee sought to recover Kovacs' assets from the receiver, the latter sought an injunction against such action. Although Kovacs had been ordered to "cooperate" with the receiver, he was disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property. What the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs. At oral argument in this Court, the State's counsel conceded that after the receiver was appointed, the only performance sought from Kovacs was the payment of money. Tr. of Oral Arg. 19–20. Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied. On the facts before it, and with the receiver in control of the site, we cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy.

Id. at 282–83, 105 S.Ct. at 709–10 [emphasis added].

It therefore appears that the receivership raised a question as to whether Kovacs could somehow have used the assets of the business entities to effectuate cleanup if he had not been precluded from doing so by the receivership. The opinion does not state what those assets were, and the Court appears to have had a question as to whether such assets included equipment and other items which could have been used to clean up. Kovacs was, however, "... disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property." Id. at 283, 105 S.Ct. at 710.

Since it was clear that as a result of the receivership the only way Kovacs could comply with the injunction would be to pay money, the injunction became a dischargeable monetary obligation. Quoting from the Court of Appeals, the Supreme Court stated:

> "*Ohio does not suggest that Kovacs is capable of personally cleaning up the environmental damage he may have caused. * * * In reality the only type of performance in which Ohio is now interested is a money payment to effectuate the Chem–Dyne cleanup.*
>
> "*The impact of its attempt to realize upon Kovacs' income or property cannot be concealed by legerdemain or linguistic gymnastics.* Kovacs cannot personally clean up the waste he wrongfully released into Ohio waters. He cannot perform the affirmative obligations properly imposed upon him by the State court except by paying money or transferring over his own financial resources. The State of Ohio has acknowledged this by its steadfast pursuit of payment as an alternative to personal performance." [*In re Kovacs*] 717 F.2d [984] at 987–988 [6th Cir.1983]. *As we understand it, the Court of Appeals held that in the circumstances the cleanup duty had been reduced to a monetary obligation.*
>
> *We do not disturb this judgment.*

*Id.* at 282, 105 S.Ct. at 709 [emphasis added].

This court concludes from the foregoing that the holding in *Kovacs* is that where a debtor in bankruptcy cannot clean up environmental contamination himself or itself without paying money, the obligation to clean up pursuant to an injunction is a debt which is dischargeable in bankruptcy. Since the definitions of "claim" and "debt" are the same regardless of the chapter in which the case is pending or the nature of the debtor, this holding applies to corporate debtors as well.[9]

The DEP argues that a different result is required by *Penn Terra Ltd. v. Dept. of Envtl. Resources,* 733 F.2d 267 (3d Cir. 1984). In that case, the debtor operated coal mines in Pennsylvania. That state's Department of Environmental Resources ("DER") entered into a consent order with the debtor which required it to take certain actions to correct violations of state environmental laws. The debtor did not comply with the consent order, ceased operations and filed a petition for liquidation under chapter 7 of the Bankruptcy Code. The debtor's remaining assets consisted of $13,500 which it had furnished to the DER as bonds for its obligations under the consent order, and $500 of other unidentified assets. The cost of cleanup was greatly in excess of the bonds.

After the bankruptcy petition, the DER brought an action in state court to compel the debtor to clean up. The state court granted injunctive relief requiring such cleanup. The debtor then filed an application to hold the DER in contempt for violating the automatic stay of Bankruptcy Code § 362(a). The DER argued that the state court proceedings and injunction fell within the exceptions to the automatic stay in Code §§ 362(b)(4) and (5) for certain actions by governmental units pursuant to their police or regulatory powers. The bankruptcy court enjoined the DER from enforcing the state court injunction on the grounds that the debtor did not have sufficient funds to comply with it. The district court affirmed, but the Court of Appeals reversed. It held that the term "money judgment" in Code § 362(b)(5) is to be construed narrowly, so that enforcement of a cleanup order other than a money judgment could proceed without obtaining relief from the automatic stay.

*Penn Terra* was issued before the Supreme Court's decision in *Kovacs. Penn Terra* distinguished the Sixth Circuit's

9. In some chapter 11 cases in which the debtor is reorganizing, the court must address the relationship between *Kovacs* and 28 U.S.C. § 959(b), which requires that a debtor in possession operate according to the valid laws of the state in which such property is situated. See this court's opinion in *In re Heldor Industries, Inc.,* 131 B.R.

578, rendered on the same date as this opinion. That section, however, is not applicable in this case because the debtor has not been in possession of the subject property since September 1985, almost four years before the filing of the bankruptcy petition.

opinion in *Kovacs* in a footnote, stating simply that "since different sections of the Bankruptcy Code are at issue which involve different policies and considerations, we are not prepared to declare that our decision is in conflict" with the Sixth Circuit's decision in *Kovacs*. *Penn Terra, supra,* 733 F.2d at 277 n. 11. Similarly, in affirming the Sixth Circuit the Supreme Court distinguished *Penn Terra:*

> ... in that case, [i.e. *Penn Terra* ], there had been no appointment of a receiver who had the duty to comply with the state law and who was seeking money from the bankrupt. The automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, *but the enforcement of such a judgment by seeking money from the bankrupt—what the Court of Appeals for the Sixth Circuit concluded was involved in this case—is another matter.*

*Kovacs, supra,* 469 U.S. at 283 n. 11, 105 S.Ct. at 710 n. 11 [emphasis added]. Thus, the Supreme Court interpreted *Penn Terra* as a case in which the state was not seeking money from the debtor. The court makes it clear that if the DER had been seeking money from the debtor, the automatic stay would have barred such an action.

This renders the relationship between *Kovacs* and *Penn Terra* unclear at first blush. The question is, if a cleanup order can only be implemented by the debtor paying money, does it make any difference for purposes of classification of that obligation under the Code whether the debtor pays a state-appointed receiver or a cleanup specialist to fulfill the obligation? The DEP has consistently taken the position in this court that *Kovacs* only applies in cases in which state-appointed receivers spend the debtor's money to clean up (which is rare), and that *Penn Terra* is the general rule, requiring the debtor to employ and pay a private cleanup specialist under Code § 362(b)(4) and (5). The DEP argues that the cleanup obligation is an unsecured claim only if a state-appointed receiver has seized the debtor's assets, and that the obligation has some higher priority if there

has been no such seizure. However, there is nothing in *Kovacs* or the Code to suggest that a cleanup obligation should receive preferred treatment in bankruptcy if the debtor spends the money to effect cleanup, but not if the state seizes and spends the debtor's money. Such a distinction has no sound basis in law or logic.

This court, therefore, believes that the DEP has distorted the relationship between these cases. In a unanimous opinion, the Supreme Court held in *Kovacs* that where the debtor cannot perform a cleanup without payment of money, a cleanup order is a monetary obligation which is dischargeable in bankruptcy. *Id.* at 283, 105 S.Ct. at 709–10. The Supreme Court also concluded that by seeking to compel payment, "... the State seeks to enforce his cleanup obligation by a *money judgment." Id.* at 285, 105 S.Ct. at 711 [emphasis added]. Comparison of the cases reveals that the Supreme Court's definition of "money judgment" in *Kovacs* is much broader than the Third Circuit's definition in *Penn Terra.* In *Penn Terra,* the Third Circuit held that "a money judgment is an order entered by the court or by the clerk, after a verdict has been rendered for plaintiff, which adjudges that the defendant shall pay a sum of money to the plaintiff." *Penn Terra, supra,* 733 F.2d at 275. It further held that "the adjudication of liability for a sum certain [is] an essential element of a money judgment." *Id.* The Third Circuit ascertained that "the definition of 'money judgment' implied in [the Sixth Circuit's opinion in] *Kovacs* and adopted by the bankruptcy court is unduly broad." *Id.* 469 U.S. at 277, 105 S.Ct. at 707. The Third Circuit added the following comment regarding the Sixth Circuit's definition of "money judgment" in *Kovacs:*

> Nor are we prepared to predict that the Sixth Circuit, if confronted with the issue that is presented in this case, would hold that the commonwealth was *enforcing a money judgment by requiring compliance with an environmental injunction. We would disagree with such a result if it did so,* for the reasons we have expressed in text. *(Id.* at 275 n. 11 emphasis added).

After *Penn Terra* was written, however, *the Supreme Court affirmed and adopted the Sixth Circuit's definition of "money judgment" in Kovacs.* The cleanup order at issue in *Kovacs* was not "an adjudication of liability for a sum certain," and it therefore did not meet *Penn Terra's* definition of "money judgment." Furthermore, the Supreme Court held that "it makes little sense to assert that because the cleanup order was entered to remedy a statutory violation, it cannot likewise constitute a claim for bankruptcy purposes." *Kovacs, supra,* 469 U.S. at 279, 105 S.Ct. at 708. Because Ohio sought payment of money to effectuate a cleanup, "the cleanup order had been converted into an obligation to pay money...." *Id.* at 283, 105 S.Ct. at 710. That obligation had become a money judgment: "... the State seeks to enforce his cleanup obligation by a money judgment." *Id.* at 285, 105 S.Ct. at 711.

In *Kovacs,* the Supreme Court distinguished *Penn Terra's* holding that the automatic stay does not apply to suits to enforce state regulatory statutes including the entry of money judgments under Code § 362(b)(5). *However, the Supreme Court clearly defined "money judgment" more broadly than the Third Circuit did in Penn Terra.* Although *Penn Terra* still stands for the proposition that a state can enforce a cleanup order against a bankruptcy estate under Code § 362(b)(5) without obtaining relief from the automatic stay, *Kovacs* now defines "money judgment." Thus, if a cleanup order entered under Code § 362(b)(5) requires that the debtor spend money, a determination must be made as to whether the cleanup order is a "money judgment" under the *Kovacs* definition.[10]

■ The significance of the definition of "money judgment," of course, is that if an obligation is not a money judgment, the state is not automatically stayed by Code § 362(a) from ordering a debtor to fulfill the obligation. A money judgment, however, is only a form of claim. Where, as in *Kovacs,* a claim is a general unsecured claim, it is not entitled to any better treatment under the Bankruptcy Code than other claims of the same level of priority. *Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir.1985). The Third Circuit noted further that *"Penn Terra* does not deal with the priority to be afforded to a claim against the estate for the cost of an environmental cleanup." *Id.*[11] If the state can compel satisfaction by a bankruptcy estate of cleanup obligations which are unsecured claims, the state can effectively overrule the Bankruptcy Code sys-

---

**10.** The debtor had no money to spend in *Penn Terra,* the case was in chapter 7, and there were presumably no further operations. What, then, did the DER accomplish in *Penn Terra?* For one thing, since the Third Circuit required that the automatic stay be vacated, the DER—which was a secured creditor to the extent of $13,500. in bonds—presumably applied the bonds to payment for cleanup. However, since there were no other assets, the cleanup order was meaningless beyond that.

**11.** Environmental cleanup obligations can have a priority higher than that of unsecured claims under certain circumstances. Such obligations can be secured by statutory liens. *Kovacs, supra,* 469 U.S. at 285–86, 105 S.Ct. at 711 (O'Connor, J., concurring). *See also* the Spill Act, N.J.S.A. 58:10-23.11f(f), and Comment, "State 'Superlien' Statutes: An attempt to Resolve the Conflict between the Bankruptcy Code and Environmental Law," 59 Temp.L.Q. 981 (1986). In addition, the cost of cleaning up any contamination which occurs postpetition will be an administrative expense under Code § 503(b). *In re Pierce Coal and Const., Inc.,* 65 B.R. 521 (Bkrtcy.

N.D.W.Va.1986). *See also In re United Trucking Service, Inc.,* 851 F.2d 159 (6th Cir.1988). *But see In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bkrtcy.N.D.Ohio 1985), holding that the cost of cleaning up prepetition contamination is also to be treated as an administrative expense. For the reasons set forth in this opinion, this court disagrees with the decision in *T.P. Long.*

For an insightful discussion of this and related issues, and other case citations, *See* Mirsky, Conway and Humphrey, "The Interface Between Bankruptcy and Environmental Laws," 46 The Bus.Law. 626, 648 (1991) and Comment, "Toxic Tug-of-War: Environmental Cleanup Costs, Bankruptcy and the Administrative Expense Priority—Is It a Collision of Conflicting Policies or Just Plain Confusion?", 21 Seton Hall Law Rev. 832 (1991).

The burden of proving entitlement to administrative expense status is on the claimant. *Matter of Patch Graphics,* 58 B.R. 743, 745 (Bkrtcy. W.D.Wis.1986); *In re Transouth Truck Equipment, Inc.,* 87 B.R. 937 (Bkrtcy.E.D.Tenn.1988). Similarly, the burden of proving the existence of a lien is on the claimant. *See* Code § 363(*o*)(2).

tem of classification and payment of obligations by designating an obligation underlying an unsecured claim as "regulatory" in nature. Since the Bankruptcy Code does not afford any priority to environmental cleanup obligations, permitting the state to effectively remove such obligations from the Code classification and payment provisions by designating such obligations as "regulatory" would violate the Code.

It follows that obligations to clean up environmental contamination which occurred prepetition, and which can only be satisfied by spending money, should generally be defined as money judgments for purposes of Code § 362(b)(5), rather than as other types of claims. Otherwise, injunctive relief would be required under Code § 105(a) in all of these cases to prevent violation of the Bankruptcy Code provisions regarding priority of payment. Congress could not have intended such a result.

Moreover, this analysis takes into account the relationship among Code §§ 362(a)(1), (a)(2), (a)(3), (b)(4) and (b)(5). Subsections (b)(4) and (b)(5) of § 362 provide that the automatic stay of § 362 *(a)(1)* and *(a)(2)* do not apply to actions to enforce police and regulatory powers. Subsections 362(a)(1) and (a)(2) merely deal with the commencement or continuation of the police or regulatory action. *(b)(4) and (b)(5), however, do not provide an exception to 362(a)(3),* which enjoins "*any act* to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[12] If subsection 362(a)(3) enjoins any such acts, it makes no difference whether the state is attempting to compel cleanup through payment of money to the state itself or to some third party who will perform the cleanup; either way, the automatic stay of § 362(a)(3) still applies, and the court must approve the expenditure as justified under the Code's classification and distribution scheme if there is any dispute about it.

The DEP also argues that cleanup is required under *Midlantic Nat'l. Bank v. New Jersey Dept. Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). Although *Midlantic* can be reconciled with *Kovacs,*[13] it is unnecessary to do so in this case, because *Midlantic* is distinguishable for a very basic reason. In *Midlantic,* the trustee was attempting to abandon property under Code § 554. Abandonment is "the release from the debtor's estate of property previously included in that estate." 2 W. Norton, Bankruptcy Law and Practice, § 39.01 (1984). *Midlantic* created a narrow exception to the abandonment power for certain types of environmental obligations. However, there can be no abandonment unless the estate has some property interest to abandon. In this case, the debtor has had no such interest for years. Hence, *Midlantic* is obviously not applicable.

## V.

### THE DEP'S CLAIM IS TIME–BARRED.

Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim is scheduled as disputed must file a proof of claim within the time prescribed by the court. Bankruptcy Rule 2002(a)(8) requires that the court clerk must give not less than 20 days notice by mail of the time fixed for filing proofs of claims under Rule 3003(c). In this case, the clerk mailed the order and notice of the bar date to the Attorney General and the DEP, but they have no record of receipt of the order, and hence they deny service.

Bankruptcy Rule 9006(e) provides that service of notice by mail is complete on mailing. There is a presumption that an item which is mailed to an accurate address has been received by the addressee. *Hagner v. United States,* 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). That presumption has been recognized in a long line of bankruptcy cases, and denial of receipt does not rebut the presumption. *In re Longardner*

---

**12.** *See* Mirsky, Conway and Humphrey, n. 11 *supra,* at 638–39.

**13.** See this court's opinion in *In re Heldor,* 131 B.R. 578 rendered on the same date as this opinion.

*& Associates,* 855 F.2d 455 (7th Cir.1988), *cert. denied* 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989); *In re Ricketts,* 80 B.R. 495 (9th Cir.B.A.P.1987); *In re Robintech,* 69 B.R. 663 (1987), *rev. on other grounds* 863 F.2d 393, *cert. denied* 493 U.S. 811, 110 S.Ct. 55, 107 L.Ed.2d 24 (1987); *United States v. Cresta,* 40 B.R. 953 (Bkrtcy.E.D.Pa.1984); *In re Thole,* 31 B.R. 548 (Bkrtcy.D.Minn.1983); *In re Cleary,* 18 B.R. 114 (Bkrtcy.W.D.Pa.1982); *In re Heyward,* 15 B.R. 629 (Bkrtcy. E.D.N.Y.1981); *In re Torres,* 15 B.R. 794 (Bkrtcy.E.D.N.Y.1981); *American Family Insurance Group v. Gumieny, (In re Gumieny),* 8 B.R. 602 (Bkrtcy.E.D.Wis. 1981). The rule is apparently to the contrary in the Sixth Circuit, according to *In re Yoder Co.,* 758 F.2d 1114 (6th Cir.1985). That case, however, is distinguishable on its facts, because there was no proof that the notice was actually mailed to the creditor, and his name was not listed on the matrix of creditors filed with the court. To the extent that *Yoder* contains language extending its holding to cases where mailing is proven, it is clearly the minority view, and its reasoning is unpersuasive.

> If a party were permitted to defeat the presumption of receipt of notice resulting from the certificate of mailing by a simple affidavit to the contrary, the scheme of deadlines and bar dates under the Bankruptcy Code would come unraveled.

*Ricketts, supra,* 80 B.R. at 497.

The Court, therefore, finds that the State of New Jersey was served through the Attorney General and DEP with the order setting the bar date for filing proofs of claim, together with notice that its claim was disputed and that it had to file a proof of claim by January 2, 1990. Since the State failed to file such a claim, Bankruptcy Rule 3003(c)(2) provides that the State shall not be treated as a creditor with respect to such claim for purposes of voting on any plan of reorganization and distribution of funds thereunder.[14]

14. For a general discussion of the filing of proofs of claim by environmental creditors, *see*

## VI.

## THE SECTIONS OF ECRA, AND REGULATIONS AND ADMINISTRATIVE ORDERS THEREUNDER WHICH PURPORT TO LIMIT THE EFFECT OF BANKRUPTCY ON CLEANUP OBLIGATIONS, AND WHICH PURPORT TO CREATE NEW OBLIGATIONS WHEN A BANKRUPTCY CASE IS FILED, VIOLATE THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION.

This opinion has thus far held that in a bankruptcy case, a cleanup obligation arising from prepetition environmental contamination is a claim which is subject to the Bankruptcy Code provisions regarding classification, distribution and dischargeability. ECRA, however, says otherwise. N.J.S.A. 13:1K–12, entitled "Obligations imposed by act not affected by bankruptcy proceedings and constitute continuing regulatory obligations imposed by state," provides as follows:

> No obligations imposed by this act shall constitute a lien or claim which may be limited or discharged in a bankruptcy proceeding. All obligations imposed by this act shall constitute continuing regulations imposed by the State.

It is therefore necessary to consider the relationship between that section of ECRA and the relevant sections of the Bankruptcy Code.

The United States Constitution, Article VI, Clause 2, provides that "[t]his Constitution, and the Laws of the United States, which shall be made in pursuance thereof ... shall be the supreme Law of the Land." Article VI, Clause 2 of the Constitution is generally referred to as the Supremacy Clause. "Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). If either

Mirsky, Conway & Humphrey, n. 11 *supra,* at 670–71.

the purpose or the effect of a state statute interferes with the effectiveness of a federal statute, the state statute is rendered invalid by the Supremacy Clause. *Id.* at 652, 91 S.Ct. at 1712–13.

In *Perez*, the plaintiff was involved in an automobile accident in Arizona which resulted in a judgment against Perez for injuries and property damage suffered by others involved. Perez did not have liability insurance. He later filed a bankruptcy petition under the Bankruptcy Act, the predecessor to the Bankruptcy Code, and received a discharge of the tort judgment. However, Arizona's Motor Vehicle Safety Responsibility Act required payment of such judgments and provided that the judgment debtor's driver's license and registration shall be suspended until such payment. § 28–1163(B) of the Arizona Act also provided that "[a] discharge in bankruptcy following the rendering of any such judgment shall not relieve the judgment debtor from any of the requirements of this Article."

The Court found that the purpose of the Arizona Act was the protection of the public using the highways from financial hardship which may result from the use of the automobile by financially irresponsible persons. *Id.* at 644, 91 S.Ct. at 1708 (quoting *Schecter v. Killingsworth*, 93 Ariz. 273, 280, 380 P.2d 136, 140 (1963)). The Court also found that one of the purposes of the Bankruptcy Act was to give debtors a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *Id.* 402 U.S. at 648, 91 S.Ct. at 1710–11. The Court stated that its function is to determine whether a challenged state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.* at 649, 91 S.Ct. at 1711. The Court concluded that the Arizona Act had both the purpose and the effect of giving judgment creditors a powerful weapon with which to force bankrupts to pay their debts despite their discharge. *Id.* at 654, 91 S.Ct. at 1713–14. Hence, § 28–1163(b) of the Arizona Act was unconstitutional.

By comparison, the primary purpose of ECRA is to ensure cleanup of property which has been contaminated by hazardous substances or wastes by requiring the execution of an approved cleanup plan as a precondition to the closure, sale or transfer of such property. Senate Energy and Environment Committee Statement, Assembly No. 1231–L.1983, c. 330, *printed in* N.J.S.A. after 13:1K–6. To that end, "[t]he bill further requires the owners of hazardous substance or waste operations to obtain a surety bond or other financial security which should guarantee the implementation of the cleanup plan." *Id.* Although the Committee Statement does not refer to N.J.S.A. 13:1K–12, it is clear that its purpose is to further the express requirement of financial security for cleanup obligations by stating that a bankruptcy proceeding shall not discharge, limit or affect an obligation imposed by ECRA.

The primary purposes of the Bankruptcy Code are to give debtors a fresh start and to provide for an orderly and equitable distribution of their assets among creditors. *See generally* Weintraub & Resnick, Bankruptcy Law Manual, ¶ 1–3 and ¶ 8–89 (1986). To those ends, "claim" is defined very broadly as, essentially, any right to payment. Code § 101(5)(A). As previously noted, the Supreme Court held in *Davenport* that "the plain meaning of 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation." 110 S.Ct. at 2131. Moreover, the Code also defines "liens" for bankruptcy purposes. " 'Lien' means charge against or interest in property to secure payment of a debt or performance of an obligation." Code § 101(37). The legislative history to § 101(37) states:

the definition is new and very broad. A lien is defined as a charge against or interest in property to secure payment of a debt or performance of an obligation. It includes inchoate liens.

H.R.Rep. No. 595, 95th Cong. 1st Sess. 312 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 25, U.S.Code Cong. & Admin.News 1978, 5787 (1978). Thus, Congress has determined what shall constitute claims and

liens for bankruptcy purposes, and those definitions are very broad. The purpose of such breadth is to deal in bankruptcy cases with all obligations of the debtor requiring payment of money. By attempting to dictate that cleanup obligations triggered by ECRA do not fall within those definitions, and hence are not affected by bankruptcy, N.J.S.A. 13:1K–12 plainly has both the purpose and effect of interfering with the Bankruptcy Code provisions in question.[15]

For the same reasons, the provisions in N.J.S.A. 13:1K–12 to the effect that cleanup obligations cannot be limited or discharged in bankruptcy also conflict with the Code. Code sections 1141(d), 727 and 523 specify which obligations shall and shall not be discharged, and they contain no reference to environmental cleanup obligations.

By defining cleanup obligations as "continuing regulatory obligations" in N.J.S.A. 13:1K–12 the State of New Jersey apparently wanted "continuing regulatory obligations" to be treated as some new class of obligations for bankruptcy purposes which transcend the categories set forth in the Bankruptcy Code as described in Section III, supra. This the State cannot do. To the extent that they require expenditure of a bankruptcy estate's money, even "continuing regulatory obligations" are either secured claims, administrative expenses, priority claims or unsecured claims as defined by Congress, and are subject to the provisions of the Bankruptcy Code regarding payment.

Because N.J.S.A. 13:1K–12 conflicts with the Bankruptcy Code in both its purpose and its effect, it violates the Supremacy Clause and is void on its face.[16]

**15.** Although N.J.S.A. 13:1K–12 says a cleanup obligation imposed by ECRA is not a lien, it is arguable that it is a lien within the broad definition of Code § 101(37), since it is arguably a "charge against" or "interest in" property. Albeit ECRA refuses to call the obligation a lien, it nevertheless treats it like one by providing that unless the obligation is satisfied prior to a transfer of the subject property, the transferee can void the sale and recover damages. *See* N.J.S.A. 13:1K–13 (West Supp.1991). Such rights are similar to the rights that the holder of an unsatisfied lien would have, in that the lien would remain a charge against the property notwithstanding the transfer. The obligation might be construed as an inchoate lien. *See Simon v. Oldmans Tp.,* 203 N.J.Super. 365, 375, 497 A.2d 204, 210 (Ch.Div.1985) (the existence of contamination covered by the Spill Act creates "the potential existence of a super lien" which must be disclosed to a purchaser).

ECRA and the other state environmental statutes do not create the obligation to clean up contamination; they merely provide procedures for enforcement of it. The state has an inherent right to require remediation of injuries to the environment. *See Department of Envtl. Protection v. Ventron Corp.,* 94 N.J. 473, 499, 468 A.2d 150 (1983) ("the Spill Act does not so much change substantive liability as it establishes new remedies for activities recognized as tortious both under prior statutes and the common law.") *See also Lansco, Inc. v. Dept. of Envtl. Protection,* 138 N.J.Super. 275, 283, 350 A.2d 520, 524 (Ch.Div.1975), *aff'd.* 145 N.J.Super. 433, 368 A.2d 369 (App.Div.1976) *cert. denied* 73 N.J. 57, 372 A.2d 322 (1977). The Spill Act, N.J.S.A. 58:10–23.11 *et seq.* covers the same hazardous substances as ECRA, and provides that if the state cleans up the contamination itself, it has a

first lien on the subject property to the extent of the cost of cleanup when a notice of lien is filed. N.J.S.A. 58:10–23–11f(f) (West Supp.1991). *See Superior Air Prod. v. NL Industries,* 216 N.J.Super 46, 522 A.2d 1025 (App.Div.1987) (analyzing the relationship between ECRA and the Spill Act). It is arguable that the state therefore has an inchoate statutory lien for cleanup obligations which are the subject of the Spill Act and ECRA, and which have not been cleaned up by the State under the Spill Act. That is exactly how purchasers and sellers of industrial establishments treat the obligation, because purchasers will not close until the obligation is satisfied or an administrative consent order is entered. However, if the obligation is not a lien, it is not because N.J.S.A. 13:1K–12 so states; it will be because the courts determine that the intention of Congress in enacting Code § 101(37) was to exclude such charges against property from the definition of lien. For purposes of this case, it is assumed that the obligation is not a lien, without deciding the question.

**16.** To the extent that *Matter of Borne Chemical Co.,* 54 B.R. 126 (Bkrtcy.D.N.J.1984) held to the contrary, this court disagrees with it and declines to follow it for the reasons set forth herein. *Borne Chemical,* however, compared the Code with ECRA generally, without focusing on the sections of ECRA addressed herein. This court does not suggest that sections of ECRA other than those addressed herein are unconstitutional. Moreover, unlike *Borne Chemical,* this opinion does not address cases in which a debtor in possession or trustee is selling or assigning contaminated real property. While this court's determinations as to the effect of ECRA on such sales and assignments will be informed in part by the analysis in this opinion, such transfers

Moreover, the other provisions of ECRA, its regulations and orders which provide for treatment of cleanup obligations in bankruptcy meet the same fate. N.J.S.A. 13:1K–8(b) states that ECRA is triggered by the filing of a bankruptcy petition. N.J.A.C. 7:26B–1.6 specifies the proceedings or events in any bankruptcy proceeding which trigger ECRA. N.J.A.C. 7:26B–1.8(A)(4) provides that any corporate reorganization not substantially affecting ownership or control of the industrial establishment does not trigger ECRA. And N.J.A.C. 7:26B–1.3 states that:

> "corporate reorganization not substantially affecting ownership" means the restructuring or reincorporation by the board of directors or the shareholders of a corporation, *which does not diminish the availability of assets for any environmental cleanup, diminish the Department's ability to reach those assets, or otherwise hinder the owner's or operator's ability to cleanup the industrial establishment....* [emphasis added].

Reading these provisions together with N.J.S.A. 13:1K–12, the obvious intent of the State of New Jersey and the DEP is to provide that when a bankruptcy petition is filed, ECRA is triggered, and either the cleanup obligation must be satisfied or the debtor's assets must remain intact and subject to the Department's ability to reach them. Both the purpose and the effect of these provisions is to require that cleanup obligations must either receive the highest priority in bankruptcy cases, or be undisturbed by them. For the reasons previously stated, the State cannot limit the definitions, purposes and effect of the Bankruptcy Code in that manner. All of the subject provisions are therefore void under the Supremacy Clause to the extent that they purport to dictate the treatment of cleanup obligations in bankruptcy cases. For the same reasons, the Administrative Order which was entered in this case, and which purported to dictate its own treatment in bankruptcy, is also void.[17]

## VII.

## CONSIDERATIONS REGARDING THE RELATIONSHIPS AMONG THE FEDERAL AND STATE LEGISLATURES AND THE COURTS.

It is appropriate to add certain additional observations, to place the foregoing analysis and conclusions in the proper context. This court does not dispute that contamination of the environment is a matter of grave concern to this country and this state.[18] There are of course different de-

---

raise questions which are beyond the scope of this case. There are compelling reasons to require trustees and debtors in possession to comply with ECRA as a condition to such transfers, and compliance in those cases may be consistent with this opinion for reasons not addressed herein.

**17.** Alternatively, if the cleanup obligation is an inchoate lien which becomes choate under ECRA when a bankruptcy petition is filed, *see* n. 15 *supra*, it is voidable under Code § 545(1)(A). Other so-called "ipso facto" clauses of statutes or contracts which are triggered by the filing of a bankruptcy petition are also void in bankruptcy. *See* 11 U.S.C. §§ 365(b)(2)(A), 365(e)(1)(A) and 541(c)(1)(B); *In re Texaco, Inc.,* 73 B.R. 960, 968 (Bkrtcy.S.D.N.Y.1987).

**18.** Arguments, however, are being made with increasing frequency in this State that environmental concerns are being exalted by state law over other public policy concerns to an extent which extracts too great of a price. An example follows from a recent New Jersey Law Journal editorial entitled "The New Religion":

> For the past 20 years or so the protection of the environment has taken on many of the attributes of a religion. Its adherents, the environmentalists, have aligned themselves against the purported forces of darkness and evil. Those who question the faith are castigated and ridiculed as heretics and worse— the very despoilers of mother earth.
> Nowhere has this passion play run as long and as consistently as in New Jersey. And we would be remiss if we failed to recognize that that which is popular is also politically expedient. Our candidates for elective office have tripped over themselves extolling their environmental records and trumpeting the strength of their commitment.

128 N.J.L.J., at 1218. (August 22, 1991). The editorial goes on to suggest that the state government's approach to environmental questions may have contributed to New Jersey's loss of almost 200,000 jobs in two years. The editorial urges greater balance and moderation by New Jersey state government in weighing economic and environmental concerns.

This court expresses no opinion on this controversy, and merely notes its existence. If it is

grees of danger presented by different types of contamination, but the worst forms can be life threatening. However, *the ultimate issue in cases such as this is not whether contamination should be cleaned up, but who must pay for it.* By attempting to compel bankruptcy estates to clean up contamination, as opposed to having the state do so, the DEP is at least as concerned with the public fisc as with the public health.[19] The DEP admits as much: "Public money is scarce; necessary cleanups abound."[20] Both concerns are of course important, but they do not enable the DEP to rewrite the Bankruptcy Code. Nor can the courts do so:

> [Courts] are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond that is to usurp a power which our democracy has lodged in its elected legislature. The great judges have constantly admonished their brethren of the need for discipline in observing the limitations. A judge must not rewrite a statute, neither to enlarge it nor contract it.

F. Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 533–34 (1947). For that reason, it has been held in this Circuit that the courts may not create a new priority of payment in bankruptcy where the Congressional mandate is clear that no such priority shall be accorded. *Southern Ry. Co. v. Johnson Bronze Co., supra; In re Columbia Ribbon Co.,* 117 F.2d 999, 1002 (3d Cir.1941). For the same reason, the courts cannot create a new priority for payment of environmental obligations, no matter how compelling the public policy concerns reflected in New Jersey's environmental laws.

We have recently seen a classic example of the proper relationship between the judicial and the legislative branches in situations such as this. In *Davenport, supra,* the Supreme Court held that restitution orders imposed as a condition of probate in state criminal proceedings were "claims" dischargeable in a chapter 13 case. Congress subsequently overruled the result in *Davenport* by withdrawing the power to discharge restitution orders in chapter 13, rather than by restricting the definition of "claim" under the Code. *See* Criminal Victims Protection Act of 1990, Pub.L. 101–581, § 3, 104 Stat. 2865. *See also Johnson, supra* 111 S.Ct. at 2154, n. 4. If a federal statute needs to be changed, that is how it should be done.

The respective roles of the state and federal legislatures and the courts in this situation can be summarized as follows. A state legislature can determine whether environmental contamination creates legal obligations. *Only* Congress, however, can determine whether such obligations constitute claims for bankruptcy purposes, and their priority and dischargeability in bankruptcy cases. A state legislature can determine whether environmental obligations shall be secured by liens on a debtor's property. *Only* Congress, however, can determine how such liens shall be treated in bankruptcy cases. And if there is a question as to whether particular obligations are claims or liens for bankruptcy purposes, the definitions provided by Congress in Code § 101 shall be dispositive. The obligation of the courts is to fulfill the legislative intent within that framework,

true, however, that the state government's approach to environmental concerns has contributed to the recession and consequent loss of employment in this State, then it would follow that that approach has also contributed to the unprecedented explosion in the number of bankruptcy cases filed in this State in the last several years.

19. *Midlantic Nat'l. Bank v. New Jersey Department of Envtl. Protection,* 474 U.S. 494, 507, 106 S.Ct. 755, 762–63, 88 L.Ed.2d 859 (1986) (Rehnquist, J., dissenting); *In re Anthony Ferrante & Sons, Inc.,* 119 B.R. 45, 50 (D.N.J.1990).

20. Brief of DEP filed March 8, 1991, at 32. It should also be noted that there are often other parties who are also responsible for cleanup, including any owner or operator other than the debtor, *see* N.J.S.A. 13:1K–9, and prior owners or tenants who caused or contributed to contamination. *See, e.g. Superior Air Prod. v. NL Industries,* 216 N.J.Super. 46, 522 A.2d 1025 (App.Div.1987).

without substituting their own views of what the statutes should provide.

For the foregoing reasons, the Debtor's motion for summary judgment is granted, and the DEP's motion is denied. This adversary proceeding is closed. The Debtor is to submit an order under the five-day rule.