**In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 17, 1994.

Harley E. Riedel, Tampa, FL, and Donald E. Engle, St. Paul, MN, for debtor.

Leonard H. Gilbert, Tampa, FL, William F. Pendergast, Chicago, IL, for Theodore Stone.

William Goldman, New York City, for Creditors' Committee.

## ORDER ON MOTION FOR ENLARGE-MENT OF TIME TO FILE PROOF OF CLAIM

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a confirmed Chapter 11 case and the matter under consideration is a Motion for Enlargement of Time to File Proof of Claim filed by Theodore Stone (Stone). The facts relevant to the resolution of this controversy as they appear in the record are as follows.

Stone's connection with the Debtor's predecessor in interest, the Singer Company (Singer) dates back to 1963 when he was hired by the Link Flight Simulation Division of the Singer Company initially as a financial trainee. In 1981, Stone was promoted and became the Director of Financing in charge of budgeting, program accounting and contact negotiations primary involving defense contracts.

During the initial period of his employment, Stone resided in and around Binghamton, New York except for 2 years when he lived in Sunnyvale, California, still working for the Link Flight Division of Singer. In 1985, Stone was transferred to another Division of Singer known as HRB, located in State College, Pennsylvania, a town with a population of approximately 35,000 people. Both Link Flight and HRB were extensively involved in the defense contracting business. In 1988, Singer became the target of a hostile takeover by Paul Bilzerian. The takeover was a success and as a result The Singer Company, a New Jersey corporation, was merged into a newly formed Delaware corporation under the name of the Singer Company. The name of the corporation was changed to Bicoastal Corporation, which is the proper name of the Debtor. After the completion of the takeover, the newly emerged corporation embarked on a divestiture program in order to retire the debt incurred in conjunction with the takeover. Shortly after the takeover, several divisions, including Simuflite, were incorporated. As part of this program all outstanding shares of Link Flight Corporation (formerly the Link Flight Division) were sold to CAE Industries, Ltd, a Canadian corporation and its name was changed to CAE–Link Corp. The contract effectuating this transaction included extensive provisions relating to CAE–Link's obligation to indemnify the Debtor for claims asserted against it for two years following the purchase of the corporation.

On November 10, 1989, The Singer Company renamed after take over as Bicoastal Corporation d/b/a Simuflite (Debtor) filed its Petition For Relief under Chapter 11 of the Bankruptcy Code. In May 1992, the Debtor filed its Amended and Restated Plan of Reorganization and its Disclosure Statement. At the conclusion of the hearing on the Disclosure Statement, this Court entered an Order approving the Disclosure Statement, and scheduled the hearing to consider the confirmation of the Amended and Restated Plan of Reorganization. The Order fixed January 30, 1990 as the bar date to file claims, to cast the ballots, to file objections to the Plan of Reorganization and Applications for allowance by professionals. Because of the unusual nature of this Chapter 11 case, this Court directed the Debtor, in addition to mailing notice to all scheduled creditors of

the bar date, also to publish the notice of the bar date in several national publications. In compliance with this order, the Debtor did publish in July, 1992 the notices which included a notice that the confirmation hearing will be held on August 19 and August 27 respectively in the *Wall Street Journal, The New York Times* and two other local publications in Stanford, Connecticut which was the headquarters of the Debtor, and Binghamton, New York where Stone was employed. The notice of the bar date was explicit and stated in no uncertain language that all claims whether contingent, fixed, unliquidated, matured or not yet matured, disputed or undisputed must be filed before the bar date or if not filed, will be forever barred.

In order to assure that all parties of interest were notified of the bar date and the date of objecting to the confirmation of the Debtor's Plan, the Debtor engaged the services of Perfect Impressions a corporation whose sole business is to copy and to mail documents such as the notice just discussed. All totalled, 20,000 notices were mailed out to all known creditors of the Debtor and 4,900 to former stockholders of the Singer Company, one of which was Stone. The notice to Stone was mailed to his correct address as follows: Theodore Stone, 106 Cherry Ridge Road, State College, PA 16803. It is without dispute that Stone lived at that address until mid-1990.

The confirmation hearing was held on August 27, 1992. The Order confirming the Plan was entered on September 14, 1992. Since the confirmation of the Plan, the Debtor has made thirteen distribution to its general unsecured creditors, all of which received their pro rata share of the fund earmarked to pay all allowed unsecured claims. On January 14, 1994 or approximately 16 months after the Debtor's Plan was confirmed, Stone filed his Motion for Enlargement of Time to File Proof of Claim. The claim sought to be filed is unliquidated and is more than $170,000. This is the motion under consideration. The following additional facts are also relevant and germane to the Motion under consideration.

## CIVIL AND CRIMINAL LITIGATION BY THE GOVERNMENT AGAINST THE DEBTOR AND STONE

In late 1988 or early 1989 federal officials began investigating Singer's business practices during the early to mid–1980's related to certain defense contracts obtained by the Simuflite Division of Singer. In March, 1989 Christopher Urda (Urda), a former employee of Singer's Link–Flight division, and The Citizens Group known as Taxpayers Against Fraud (Taxpayers) filed a suit colloquially referred to as a "whistle-blower action" against Singer and others in the United States District Court in Maryland. When the complaint was unsealed, the Government took over the prosecution of the suit in which Urda and Taxpayers sought compensatory and multiple damages under the False Claims Act, 31 U.S.C.A. § 3729. It is without serious dispute that by late 1988 or early 1989 Stone was aware that Singer might face criminal charges in addition to the civil liability sought in the Urda suit. Stone was intimately involved in the negotiations of Government contracts which were conducted under his supervision while he was Director of Finance of Link–Flight. Notwithstanding, Stone claims that he did not believe that he had any potential civil or criminal liability prior to January 31, 1990, the bar date fixed by the court in the Debtor's Chapter 11 case.

In March 1990, Stone was served with a subpoena requiring him to appear before the Grand Jury in New York which was convened to investigate the alleged fraudulent claims made by Singer in connection with several defense contracts. Even though he believed that he was not a target but merely a witness, Stone contacted CAE–Link and sought their advice as to the proper way to handle the subpoena. CAE–Link referred Stone to the law firm of Sayfarth, Shaw, Fairweather & Geraldson (Sayfarth & Shaw). Upon advice of CAE–Link, Stone retained the Law Firm and was represented by Sayfarth, Shaw in the criminal proceeding from 1990 until 1993.

In mid–1991, Stone learned that he was in fact a target and was, in fact, indicted together with Bicoastal and some other individuals in July, 1992. The indictment against Stone

was dismissed in late 1992, but upon Motion For Rehearing filed by the Government, the indictment was reinstated in 1993. In mid-1993 the criminal case was concluded by a plea of guilty by Bicoastal to one felony count and Bicoastal was fined $1 million. Three other individuals plead guilty to misdemeanor counts and the indictment against Stone was dismissed.

CAE–Link paid Stone's legal expenses from the beginning of the representation by Sayfarth, Shaw in connection with the proceeding just described up to August, 1992 when CAE–Link notified Stone that it would no longer pay his legal fees. On August 20, 1992, Stone's counsel wrote to Bicoastal inquiring whether it would assume the cost of Stone defense. Bicoastal declined and never agreed to pay any of Stone's legal expenses. On September 11, 1992 Stone's counsel recommended to the law firm's executive committee that the firm or Stone should pursue collection of its legal fees from CAE–LINK or from HRB SYSTEMS. The Executive Committee having concluded that Stone's legal fees could not be recovered from the Debtor, CAE–Link agreed to pay Sayfarth, Shaw an additional $150,000 on behalf of Stone.

On January 14, or approximately 16 months after confirmation of the Debtor's Plan of Reorganization and four years after the bar date fixed by this Court for filing claims, Stone filed his present Motion in which he seeks an Order to enlarge the time to file an unliquidated claim in the amount of $170,000, which according to Stone still continues to grow.

Basically these are the relevant facts established at the final evidentiary hearing upon which Stone seeks a favorable consideration of his Motion to allow him now to file a proof of claim which is unliquidated in the approximate amount of $170,000 plus interest.

## STONE'S CLAIM OF LACK OF NOTICE OF BAR DATE

■ Stone's claim of lack of notice is supported only by his unsupported assertion that he did not receive a "written notice" of the bar date. To refute this assertion, the Debtor presented ample evidence that he did indeed receive the notice. First, there is evidence in this record which is unrefuted that Stone was scheduled on the matrix with his correct address. Second, mailing was accomplished by a professional organization supervised by an attorney of the Debtor. Third, the notice sent to Stone was not returned as undeliverable or with the notation that "addressee is unknown." There is a legal presumption that when an item is properly addressed and placed in a mail box approved by the U.S. Post Service, it will arrive and will be delivered. *In re East Coast Brokers & Packers, Inc.,* 961 F.2d 1543 (11th Cir.1992). Based on that presumption, the Bankruptcy Court in the District of New Jersey in the case of *Linder v. Trump's Castle Associates,* 155 B.R. 102, 104–07 (D.N.J.1993) held that a mere denial of non-receipt is insufficient to rebut the presumption. The District Court reversed the Bankruptcy Court (Civ. No. 93–371, not generally reported) and doubted whether or not the mere denial rule is still viable and this conclusion was based on the case of *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) which, according to the District Court, created a more lenient standard for excusable neglect. Thus, the confirmed viability of the presumption is not undisputed and may be questionable if one accepts the reasoning of the District Court in *Linder, supra.*

The difficulty with the reasoning of *Linder* is that it was not an excusable neglect case which was involved in *Pioneer Investment* and in the case of *In re Torwico,* 131 B.R. 561, 572–73 (Bankr.D.N.J.1991) and the rule announced in that case is not really applicable in the present instance because the receipt of the written notice is flatly denied by Stone.

■ A stronger authority for the sufficiency of the "mere denial" rule is stated in the case of *In re Yoder Co.,* 758 F.2d 1114 (6th Cir.1985) where the Sixth Circuit rejected the proposition that the receipt of a notice of a bar date would be presumed if the notice was mailed properly and held that testimony

of non-receipt is sufficient to rebut the presumption of receipt. *McKentry v. Secretary of HHS,* 655 F.2d 721, 724 (6th Cir.1981); *Baldwin v. Fidelity Phenix Fire Insurance Co.,* 260 F.2d 951, 953 (6th Cir.1958). This Court is constrained to reject a pragmatic application of the principles enunciated by *Yoder, McKentry* and *Baldwin* for the following reasons.

The evidence in this instance is overwhelming that the Debtor, as noted earlier, published the notice of the bar date in the Wall Street Journal, the New York Times, two local publications, one in Binghamton, New York, where Stone worked, the other in Stanford, Connecticut, the then headquarters of the Debtor. In addition to the undisputed fact that the written notice of the bar date was properly addressed to Stone and mailed at his proper address and in light of these circumstances there is hardly any way for a debtor to overcome a mere denial that Stone did not receive the mail which he claims although his denial is not really categorical but equivocal since he stated that he does not recall having received the same. In sum, the evidence is overwhelming that Stone did in fact receive the notice of the bar date in addition to the wide publicity of the Debtor's Chapter 11 case which certainly could not have escaped Stone's attention since he was at one time intimately involved with the Link–Flight Division of Singer whose activity in connection with numerous defense contracts were already under investigation by the Government even prior to the commencement of the Debtor's Chapter 11 case. The fact of the matter is that he was interviewed in connection with the investigation as early as November 1989. Based on the foregoing, this Court is more than satisfied that; first, Stone was fully aware of the Debtor's Chapter 11 case prior to the expiration of the time for filing claims and to cast ballots; and second, Stone did in fact receive the notice to cast ballots.

## ADEQUACY OF THE NOTICE

This contention is based on the assertion of Stone that the notice, even if he received the same, a fact which he denies, the notice was inadequate because it merely notified him as a stockholder of Singer but did not put him on notice that he might have a claim for indemnification. This claim is based on the proposition which borders on the absurd that there is legal duty placed on the Debtor to describe in the notices the type of claim or interest the addressee has against the Debtors. Moreover in this instance, that the Debtor somehow could have pre-guessed that Stone might make such a claim four years after the commencement of the Chapter 11. This contention misses the mark completely and so is Stone reliance on the newly expended doctrine established by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). First, *Pioneer* obviously applies only when a party who seeks to file a late claim did receive the proper notice, a fact vigorously denied by Stone, but seeks leave to file one based on "inadvertence", "mistake" or "carelessness" as well as intervening circumstances beyond the party's control. *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, supra.* Under the more lenient standard of *Pioneer* a late-filed claim should be permitted where the omission was caused by "inadvertence, mistake or carelessness as well as intervening circumstances beyond the party's control." In addition, before a late-filed claim is permitted, the failure to file a timely claim must be excusable. According to the Supreme Court the real test is (1) what is the danger or prejudice to the Debtor if the claim is permitted to be filed (2) the length of delay and its potential impact on the judicial proceeding (3) the reason for the delay including whether the delay was within the control of the creditor and (4) whether the creditor acted in good faith. Having concluded that Stone failed to overcome the presumption of receipt, one must consider whether his failure to act would be acceptable as "excusable neglect" under the standard enunciated by the Supreme Court in *Pioneer Investment.* In addition, one must also consider whether a late filed claim should be permitted to be filed unless the claimant meets the test set forth by the Supreme Court in *Pioneer Investment* recited earlier.

■ In the present instance, it is without dispute that Stone was aware that the Government already commenced an investigation into the possible violation of the false claims act by Singer–Link and also a possible civil liability based on the same statute. At the time, Stone was the director of finance of Link Flight Simulation Division and it is without dispute that by July 1989 he became aware that he may be exposed to civil liability. The focus of the investigation of the Government was related to defense contracts which were negotiated by his department and under his supervision and the matter of possible exposure to civil or possibly criminal liability became painfully aware to all when the whistle-blower suit was filed by URDA and Taxpayer's Against Fraud in March 1989 or about six months prior to the commencement of this Chapter 11 case. On March 29, 1990, Stone was subpoenaed to appear before the Grand Jury in New York, the Grand Jury which was investigating the billing practices of Link Flight Simulation Division, the division of which Stone acted as a director of finance and in charge of negotiating the defense contracts. The fact of the matter is that Stone became aware that he will need legal representation and did, upon the advise of CAE–Link, retain the law firm of Sayfarth, Shaw on April 5, 1990 or several months before Bicoastal's plan of reorganization was confirmed. It appears that at the meeting which took place on April 5, 1990 between a partner of the law firm, Mr. Pendergast, and Stone, Stone knew of the possibility of indemnification by Bicoastal.

A file memorandum of this meeting indicates that the corporate indemnification was discussed with Stone. (Bicoastal's Exhibit No. 9). Stone was obviously satisfied with the arrangement with CAE–Link who agreed to underwrite Stone's legal expenses and in fact paid Stone's legal expenses until August 1992. Stone's choice to look to CAE–Link for reimbursement of his legal expenses, while understandable, this decision under the circumstances did not prevent Stone from asserting a claim for indemnification against Bicoastal, notwithstanding the fact that the bar date had already expired. Thus nothing prevented Stone from seeking leave at that time to file a late claim or possibly object to confirmation of the plan. It was not until August 1992 when CAE–Link informed Stone that it would no longer pay any of the legal fees that Stone considered pursuing any claim for indemnification against the Debtor. It appears that Mr. Pendergast, the attorney in charge of defending Stone, informed the executive committee of the law firm of the problem with payment for the continuing representation of Stone (Bicoastal's Exhibit No. 10). In this memorandum, Pendergast detailed the steps to be taken to assure payment of their legal fees and stated that he contacted counsel for Bicoastal concerning the payment of Stone's legal fees but noted since Bicoastal is in bankruptcy, it is unlikely that the law firm will be able to collect anything from Bicoastal. (Bicoastal's Exhibit No. 10). Mr. Pendergast suggested two options. One, to stay with CAE or pursue HRB Systems.

Based on the foregoing, it is evident that the failure to act by Stone has nothing to do with neglect but it was a conscious business decision at that time not to pursue Bicoastal. Even after being informed by CAE–Link that they will no longer pay Stone's legal expenses, Stone did nothing to pursue his claim against Bicoastal, obviously because he assumed that there was little or no money available for distribution in Bicoastal's Chapter 11 case.

Considering the balance of the prejudice which is one of the factors to be considered under the standard set forth by the Supreme Court in *Pioneer Investment*, it should be pointed out that the Debtor has already made 13 distributions under the Plan. If Stone's claim is allowed, a substantial effort must be exerted to recalculate the dividends already paid to creditors. Needless to say, this process would not only be time consuming but costly. The reorganized Debtor has only three employees and by necessity would have to employ outside help to complete this process. In addition, the Debtor will be required to engage now, more than two years after the Plan has been confirmed, in extensive litigation concerning the validity of Stone's claim for indemnification. It is without dispute and it is conceded by Stone that he had no written contract of indemnification

with the Debtor's predecessor-in-interest, and reliance on the corporate law of the State of Delaware may not be relied on because the applicability of Delaware law is far from conceded by the Debtor. The Debtor asserts both factual and legal defenses to the claim. Whether or not the amount remains unpaid due to the law firm is a matter yet to be determined.

In addition, Stone's delay in asserting his claim for indemnification has seriously prejudiced the Debtor's ability to pursue CAE Industries, Ltd. and CAE–Link under the contractual arrangement with CAE–Link under which CAE agreed to assume certain pre-sale obligations of the Debtor and arguably which would include any obligation to indemnify former employees of Singer such as Stone. Between 1990 and August 1992, the date of confirmation, Bicoastal entered into a series of settlements and releases with CAE which most likely would preclude the Debtor from pursuing CAE–Link now. Moreover, contractual provisions had certain notice requirements which also may give CAE additional defenses based on passage of time.

Based on the foregoing, there is no doubt that to pursue CAE now would be far more difficult and more costly than it would have been in 1990 or 1991 if Stone had asserted a claim of indemnification against the Debtor during that time period. The time period involved here is not the 20 days involved in *Pioneer Investment*, but four years. In *Pioneer Investment*, there was no plan confirmed and in this instance the Debtor's Plan was confirmed two years ago. The delay involved here clearly has a significant and obvious impact on the judicial administration. As noted earlier by this Court in a similar controversy:

> While there might have been slight prejudice to the Debtor to grant a motion to file a late claim soon after the bar date passed, such is clearly not the case nearly one and one-half years after the expiration of the bar date ... To require the Debtor to begin litigation with another unliquidated, contingent creditor would clearly be prejudicial....

*In re Bicoastal Corp.*, 147 B.R. 807, 809–10 (Bankr.M.D.Fla.1992).

One last comment concerning whether or not Stone acted in good faith. As noted earlier, the reason for the delay in asserting a claim was, at least in part, based on Stone's belief, and his attorneys', that it was pointless to assert a claim against the Debtor because it would have been unlikely that there were any funds available to assert a claim. The decision to file or not to file was fully within Stone's control and was based on the then-held belief of Stone that it was economically pointless to pursue the Debtor, especially in light of the fact that there was already a willing "deep pocket" available which had in fact paid Stone's legal expenses until August 1992 and even after settled with Stone and paid the sum of $150,000 on account of Stone's legal fees incurred after August 1992.

Considering the foregoing, this Court is satisfied that the Motion under consideration is not well taken and should be denied.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Enlargement of Time to File Proof of Claim be, and the same is hereby, denied.

DONE AND ORDERED.