193 B.R. 730 (1996)
In the Matter of LAN ASSOCIATES XIV, L.P., Debtor.
Bankruptcy No. 92-13412.
United States Bankruptcy Court, D. New Jersey.
February 16, 1996.
*731 Peter C. Hughes, Dilworth, Paxson, Kalish & Kaufman, Philadelphia, Pennsylvania, for Metro Commercial Real Estate, Inc.
Glenn R. Reiser, Nagel, Rice & Dreifuss, Livingston, New Jersey, for Debtor.
Bruce Buechler, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, Roseland, New Jersey, for Antonio Reale.

OPINION
JUDITH H. WIZMUR, Bankruptcy Judge.
Before the court is a motion by Metro Commercial Real Estate, Inc., an unsecured creditor of debtor's estate, for allowance of its late filed claim, filed in conjunction with the rejection of its pre-petition executory contract with the debtor partnership.

FACTS
Recognizing that the United States Supreme Court's decision in Pioneer Inv. Services v. Brunswick Assocs., 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) requires a fact-sensitive examination of the record to determine whether the totality of the circumstances supports the filing of the late proof of claim, we review the procedural history of debtor's case, the aspects of the case involving Metro, and the events leading up to the motion under consideration. See Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir.1995).
*732 I. Procedural History:
Debtor, LAN Associates XIV, L.P., was the owner of certain real property, consisting of approximately 90 acres of raw land located at Oxford Valley Road and U.S. Route 1 in Falls Township, Bucks County, Pennsylvania.[1] The property was subject to a mortgage held by the Howard Savings Bank (succeeded by the Federal Deposit Insurance Corporation as receiver in November, 1992) in the approximate amount of $14 million. Pursuant to a plan to develop the property as a shopping center, to be known as the Plaza at Oxford Valley, LAN Associates hired plaintiff Metro Commercial Real Estate, Inc. ("Metro") to serve as its leasing agent. Although the leasing agreement was scheduled to terminate on November 1, 1991, the parties voluntarily extended the agreement six times until December 15, 1992. Prior to the filing of debtor's bankruptcy petition, Metro obtained several signed leases for the debtor's project.
On July 6, 1992, LAN Associates filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code.[2] The first meeting of creditors was scheduled for September 1, 1992, and the deadline to file a proof of claim was set for November 20, 1992.[3]
Following a series of negotiations, debtor and Goldenberg Development, Inc. ("GDI") entered into an agreement of sale dated September 15, 1993 for the sale of debtor's single real property asset to GDI for $10.7 million, subject to higher and better offers. The FDIC supported the sale. Jack R. Loew of Hough/Loew Associates, who asserted that his interest in the project was initiated and maintained by Metro, submitted a competing bid. At a hearing on the sale on November 29, 1993, following a vigorous auction held in court, GDI was the successful bidder for the property at $14.55 million. The sale to GDI was approved under 11 U.S.C. § 363(b), and an order was entered on December 23, 1993. Metro's objection to the sale was overruled. The purchaser, GDI, declined to assume the leases arranged by Metro and conditioned the purchase on the rejection by the debtor of the leasing agreement with Metro.[4]
On December 12, 1994, debtor filed its proposed Chapter 11 Plan of Reorganization and Disclosure Statement.[5] As amended on January 27, 1995, debtor's disclosure statement describes the additional terms of the sale to GDI as follows:
The Agreement of Sale also provides that GDI will pay $50,000.00 to provide for payment to counsel for the Debtor. Subsequent to the approval of the Agreement of Sale by the Bankruptcy Court, GDI requested that the Debtor file a Complaint with the Court to fix the assessment of the Real Property since same has allegedly been over-assessed for many years. The result of such overassessment is that there is a little over a million dollars in real estate taxes presently charged against the Real Property. Under the Agreement of Sale, all real estate taxes were to be purchased by GDI. As a result of GDI's assertion that the property is over-assessed, the Debtor and GDI entered into an arrangement, pursuant to which the Debtor has agreed to challenge the amount and the validity of the real estate tax assessment and as a result GDI has agreed to pay the Debtor a sum equal to twenty-five percent (25%) of any tax savings achieved. Since GDI is obligated to pay all real estate taxes, any savings would not *733 otherwise inure to the benefit of the Debtor. However, as a result of this arrangement with GDI, it is possible that the Debtor will generate sums as a result of the reduction in taxes which would otherwise not become part of the estate.
Disclosure Statement pp. 6-7.
Debtor's plan proposed to liquidate rather than reorganize debtor's estate. The Plan provided for the payment of $14,550,000.00 to the FDIC in satisfaction of its interest, and for the creation of a Plan Fund, comprised of the potential 25% tax savings explained above plus the balance remaining after payment of allowed administrative expenses, plus any other sums held by the debtor. Id. at 8-9. See Articles 1.24, 2.1, 6.2 and 9.3 of debtor's Plan. Pursuant to the Plan, priority claimants were classified as Class 1, the FDIC constituted Class 2, general unsecured creditors were included in Class 3, and the interests of the limited partners were included in Class 4. It was expected that under the Plan, Class 1 and Class 2 would be paid as indicated, Class 3 would receive nothing, unless there was a recovery from the tax appeal and there were any remaining funds after the payment of the administrative expenses, and Class 4 would receive nothing.
On January 30, 1995, debtor's disclosure statement was approved for adequacy and an order was entered on February 10, 1995. Debtor's liquidating plan was confirmed on April 25, 1995.
II. Background with respect to Metro:
Following debtor's filing, Metro continued to solicit new tenants and even obtained a new tenant for the subject property. On September 4, 1992, counsel for Metro filed a request for notice of all further pleadings, notices, or other correspondence. Debtor filed a motion on September 18, 1992 to assume the leasing agreement with Metro, as an executory contract pursuant to 11 U.S.C. § 365. This motion was adjourned and regularly continued, apparently at the debtor's request, over a period of thirteen months, and ultimately denied by court order dated December 23, 1993 approving the sale of debtor's property to GDI. An application to employ Metro as a real estate broker for the debtor was filed on September 25, 1992. An objection to the application was filed by FDIC's predecessor in interest, Howard Savings Bank. Apparently, the application was never pursued by the debtor and was never approved. None of the leases mentioned above were ever assumed by the debtor.
On December 12, 1994, nearly a year after its executory contract with the debtor had been rejected, Metro filed a complaint, adversary no. 94-1436, to recover certain commissions from the FDIC, allegedly owed by the debtor on the leases arranged by Metro. Metro relied primarily upon 11 U.S.C. § 506(c). Following a hearing on July 10, 1995, we granted the FDIC's motion to dismiss, and an order was entered on August 7, 1995.[6] We relied on 11 U.S.C. § 365(g)(1), which governs the import of the rejection of Metro's executory contract by the debtor and provides that such a rejection "constitutes a breach of such contract . . . immediately before the date of the filing of the petition." Accordingly, by operation of law, debtor's breach of the lease agreement with Metro, including provisions regarding a minimum lump sum payment in the event that the property is sold, gave rise to an unsecured pre-petition claim by Metro against the debtor.
As to plaintiff's post-petition activities in arranging leases for the debtor, we noted that as a general matter, it is well recognized that administrative priority status cannot be granted in the debtor's estate for professional services unless the court has authorized the employment prior to the performance of the services. We concluded that the plaintiff operated at its own risk following the filing of the petition in the absence of specific court approval. In this regard, we observed that there was never an application or a written agreement to retain Metro as a broker to sell the property. The leasing agreement between the debtor and Metro, as well as the application to retain Metro as a broker, related only to Metro's activities in procuring tenants for the project.
*734 There was no dispute that prior to the filing of the petition, plaintiff held a valid, binding agreement with the debtor to procure tenants for debtor's project. The agreement made specific provision that in the event of the sale of the property and election by a third party purchaser to terminate the agreement, the debtor would be responsible to Metro to pay a real estate sale commission which would in no event be less than $300,000. Neither could it be disputed that Metro performed valuable services for the debtor in procuring tenants for the project, which would have been of value to the debtor if the project had been developed as initially contemplated. Nonetheless, we concluded that these services, however valuable at the time, simply produced a pre-petition claim held by Metro against the debtor.[7]
Following the rejection of its 506(c) cause of action, Metro filed a motion for relief from the stay to seek a judgment against the debtor and Antonio Reale as defendants for breach of the pre-petition leasing agreement. For procedural purposes only and not to allow recovery of a judgment against the debtor,[8] Metro's motion was granted on April 25, 1995. There is no indication in the record that an order reflecting the relief granted was submitted or entered.
III. Events leading to Metro's filing of a proof of claim:
On October 16, 1995, Antonio Reale moved to vacate the order confirming debtor's Chapter 11 Plan to allow a modification of the plan as a result of monies received from a successful real estate tax appeal.[9] Since Classes 1 and 2 were satisfied pursuant to the terms of the Plan, and the unsecured creditors in Class 3 will receive a dividend, Mr. Reale's proposal sought a distribution of any excess funds to the equity holders.[10]
Both the FDIC and Metro filed objections to Mr. Reale's motion. Asserting that no bar date had been set by the court for the filing of a claim in connection with the rejection of its executory contract with the debtor, Metro also filed a proof of claim in the amount of $769,000.[11] At a hearing on November 20, 1995, we granted Mr. Reale's motion to modify *735 debtor's confirmed plan to provide that Class 4 equity holders will receive any excess monies after all prior classes are paid pursuant to the terms of the plan.[12]
On December 1, 1995, Metro filed a motion for allowance of its claim. Metro now acknowledges that pursuant to Local Rule of Bankruptcy Procedure 26(b),[13] rejection claims must be filed within 30 days of the date of rejection. In this case, the rejection of the executory contract with Metro was effective as of the date of the order approving the sale of debtor's real property, December 23, 1993. The time for filing a proof of claim under Local Rule 26(b) expired on or about January 24, 1994. Metro explains its failure to file a timely proof of claim as follows:
At the time a proof of claim was required to be filed, the Debtor's real estate had been sold for less than the amount of the FDIC's secured debt and the Debtor had incurred substantial administrative claims. Indeed, the Debtor later filed a plan which provided that no distribution would be made to unsecured creditors. Accordingly, Metro did not expect that any funds would be available for unsecured creditors. Metro did not file a proof of claim because it appeared that filing the proof of claim would be futile.
Certif. of Peter C. Hughes, Esq. in Support of Metro's Motion at 2-3.
Metro submits that its claim should be allowed, notwithstanding its late-filed status, on the basis that its failure to file timely constitutes excusable neglect within the framework established in Pioneer Inv. Services v. Brunswick Assocs., 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). According to Metro, there was little prospect of a dividend to unsecured creditors at the time of the sale of the property or at the time of the confirmation of the plan, and the filing of a proof of claim appeared to be futile until an actual recovery from tax savings was achieved by the estate. Allowing Metro's claim will not prejudice the estate or delay its administration, because the debtor has completed the sale of its property and confirmed a liquidating plan. All that is left is to distribute the cash on hand to administrative and unsecured claimants.
In response, Antonio Reale contends that application of the Pioneer factors should defeat the Metro claim. Reale asserts that allowing the claim would be prejudicial to the debtor in that it would vastly dilute funds available to other unsecured creditors, and it would delay distribution pending resolution of the extent of the claim. As well, Reale suggests that in its § 506(c) action against the FDIC and its state court action against the FDIC and Reale, Metro has elected to pursue the FDIC and Antonio Reale instead of pursuing the debtor, and has, in effect, waived its claims against the debtor. According to Reale, Metro was noticed by the plan provisions and at the confirmation hearing, which Metro's counsel attended, that unsecured creditors might receive a dividend from potential tax savings achieved by GDI's challenge to the property assessment.[14] *736 Reale submits that there is no justification under these circumstances for the allowance of Metro's late-filed claim.
In conjunction with his objection, Reale also sought the imposition of sanctions against Metro under F.R.Bankr.P. 9011 and 28 U.S.C. § 1927 asserting that Metro's motion "is patently unmeritorious and frivolous because it has no basis in law or in fact." Reale Brief at 10.
At the January 3, 1996 hearing on this matter, we declined to conclude that Metro's pursuit of a § 506(c) cause of action against the FDIC constituted a waiver of its claims against the debtor, or that Metro's request for relief from stay was an election of remedies, which precluded the filing of a proof of claim. We also rejected Reale's cross motion for sanctions. We reserved decision on whether Metro's late-filed claim could be allowed.

DISCUSSION
Federal Rule of Bankruptcy Procedure 3003(c)(3)[15] allows the court to fix a bar date for the filing of proofs of claim and "for cause" to extend that time period. New Jersey bankruptcy courts have fixed the deadline to file a proof of claim by local rule. Under Local Bankruptcy Rule 26(b), a proof of claim arising from the rejection of an executory contract shall be filed within thirty days after the date of rejection.[16] Under Bankruptcy Rule 9006(b)(1),[17] for cause shown, a court may permit a proof of claim to be filed out of time where the failure to file the proof of claim was the result of excusable neglect.
The Rule 9006(b) excusable neglect standard was addressed by the United States Supreme Court in Pioneer Inv. Services v. Brunswick Assocs., 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The Pioneer Court recognized a range of possible explanations for a creditor's failure to file a timely claim:
. . . At one end of the spectrum, a party may be prevented from complying by forces beyond its control, such as by an act of God or unforeseeable human intervention. At the other, a party simply may choose to flout a deadline. In between lie cases where a party may choose to miss a deadline although for a very good reason, such as to render first aid to an accident victim discovered on the way to the courthouse, as well as cases where a party *737 misses a deadline through inadvertence, miscalculation, or negligence.
507 U.S. at 388, 113 S.Ct. at 1494. [Emphasis in original]. In the "in between" cases, where "neglect" on the part of a party in missing a deadline is shown to be "excusable", the party may qualify for extension of the deadline under Bank.R. 9006(b).
Using Webster's Ninth New Collegiate Dictionary, the Court defined "neglect" to mean "`to give little attention or respect' to a matter, or, . . . `to leave undone or unattended to esp[ecially] through carelessness.'" 507 U.S. at 388, 113 S.Ct. at 1494-95 (citing to Webster's Ninth New Collegiate Dictionary 791 (1983)) [Emphasis in original]. The Court defined the term neglect to include "both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." 507 U.S. at 388, 113 S.Ct. at 1495. The majority found that "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." 507 U.S. at 388, 113 S.Ct. at 1495.
As to whether the negligent conduct of the party seeking extension of a deadline is "excusable," the Court explained that the equitable determination requires "taking account of all relevant circumstances surrounding the party's omission." 507 U.S. at 395, 113 S.Ct. at 1498. Among the circumstances to be considered are:
(1) the danger of prejudice to the debtor,
(2) the length of the delay and its potential impact on judicial proceedings,
(3) the reason for the delay, including whether it was within the reasonable control of the movant, and
(4) whether the movant acted in good faith.
Id. See also Chemetron Corp. v. Jones, 72 F.3d 341, 349 (3d Cir.1995).
In this case, Metro's failure to file a timely proof of claim neither constitutes "neglect" nor qualifies as "excusable" under the Pioneer criteria. As to the characterization of Metro's omission as "neglect", Metro acknowledges that it consciously and deliberately failed to file a timely proof of claim because it appeared that filing the proof of claim would be "futile". There was no expectation on Metro's part, either at the time of the sale of debtor's property or at the time of debtor's plan confirmation, that there would be assets to distribute to unsecured creditors. In other words, Metro's failure was not due to inadvertence, carelessness, mistake, or faultless omission. Rather, the failure represented a conscious business decision by Metro, arising from its evaluation of debtor's circumstances, including the apparently undersecured status of the FDIC's claim, the substantial administrative claims incurred, and the unlikely prospect of a dividend to unsecured creditors, that filing a proof of claim would be "futile". Even when a liquidating plan was confirmed which created a potential, albeit speculative, Plan Fund for unsecured creditors, Metro relied upon the prospect that no distribution would be made to unsecured creditors and elected not to file a proof of claim. Metro was not prevented from complying by forces beyond its control, or by neglect or carelessness. It simply "chose" not to file. On the Pioneer spectrum of reasons for not making a timely filing, Metro's failure is akin to choosing "to flout a deadline." 507 U.S. at 388, 113 S.Ct. at 1494.
We conclude that Metro's failure to file a timely proof of claim did not constitute "neglect" under F.R.Bankr.P. 9006(b) as defined in Pioneer. Therefore, we must deny Metro's quest to enlarge the time to file a proof of claim.
Our conclusion that the concept of "neglect" is absent in this case accords with other court decisions in similar circumstances. In Agribank v. Green, 188 B.R. 982, 989 (C.D.Ill.1995), the district court determined that the plaintiff's deliberate choice in delaying its filing until after the bar date did not constitute "neglect", a decision that obviated the need to reach the issue of whether or not that action was "excusable".[18] The court stated that "the prerequisite to using such a balancing test to determine whether an action or omission is `excusable' is a finding *738 that the claimant's behavior constitutes `neglect' as that term is understood in its `ordinary, contemporary, [and] common meaning.'" Id. See also In re Brown, 159 B.R. 710, 717-18 (Bankr.D.N.J.1993) (The Supreme Court's definition of neglect "virtually excludes any possibility that a late filing which is the result of a party's deliberate choice can constitute `neglect'.")
In In re Bicoastal Corp., 176 B.R. 966 (Bankr.M.D.Fla.1994), a former employee of the Chapter 11 debtor moved to file a late claim for indemnification for legal fees nearly four years after the bar date. The court found that:
it is evident that the failure to act by [the employee] has nothing to do with neglect but it was a conscious business decision at that time not to pursue [the debtor]. Even after being informed by [the purchaser of one of the debtor's divisions] that they will no longer pay [the employee's] legal expenses, [the employee] did nothing to pursue his claim against [the debtor], obviously because he assumed that there was little or no money available for distribution in [the debtor's] Chapter 11 case.
Id. at 971. The court remarked that "[t]he decision to file or not to file was fully within [the employee's] control and was based on the then-held belief of [the employee] that it was economically pointless to pursue the Debtor." Id. at 972.
Even assuming Metro's failure to file a timely proof of claim could be characterized as "neglect", we conclude that Metro's cause would fail because its omission cannot be deemed "excusable" under the applicable standards. As we noted above, we must consider all relevant circumstances including such factors as prejudice, delay and good faith.
A. Prejudice:
Metro asserts that in a Chapter 11 liquidation, there can be no prejudice to the debtor, but only to unsecured creditors, whose pro rata distribution will be reduced. Reale claims that the reduction in pro rata distribution, as well as the delay, constitutes prejudice to the debtor. We have seen varying perspectives on this issue in the case law.
In In re Sacred Heart, 186 B.R. 891 (Bankr.E.D.Pa.1995), the court concluded that in a liquidating Chapter 11 case:
there is no reorganizational plan or purpose which is served by a claims bar date. Allowance of a late claim, in such circumstances, will generally merely result in a slightly different distribution of a liquidating debtor's assets. Exactly how the debtor's assets are distributed is ultimately of little consequence to the debtor, so long as the claim is not filed so late as to disrupt the distribution process.
Id. at 897. Judge Scholl allowed a claim filed less than four months after the bar date, where the Chapter 11 liquidating plan was confirmed after the claim was filed, and where no prejudice to the debtor or to the distribution process could be discerned.
In In re Lee Way Holding Co., 178 B.R. 976, 985 (Bankr.S.D.Ohio 1995), a Chapter 11 debtor's computer equipment lessor filed a $3,000,000 claim for lease rejection damages eight years after the bar date for filing claims. Concluding that the lessor had failed to meet its burden of proving excusable neglect, the court noted the distinction drawn in Pioneer between Chapter 7 liquidation cases requiring "prompt closure and distribution of the debtor's estate", and Chapter 11 reorganization cases "with the aim of rehabilitating the debtor and avoiding forfeitures by creditors." Id. (citing Pioneer, 507 U.S. at 389, 113 S.Ct. at 1495). In a Chapter 11 liquidating mode, in the context of applying the Pioneer equitable factors to determine whether excusable neglect was established, the court expressed concern regarding the delay in the administration of the estate, and the impact on the dividend to unsecured creditors. "The Trustee and creditors are entitled to a level of certainty as to the potential claims pool to allow for case administration and plan projections. If allowed, the [untimely claim] would significantly reduce the dividend to timely filed claims." Id.
We need not choose between these seemingly differing approaches on the issue of prejudice. We are convinced that under either formulation, the late filed claim in this case would be disallowed as prejudicial to the distribution process. Debtor's liquidating *739 plan was confirmed in April, 1995, with the assent of unsecured creditors who presumably believed that distribution would follow plan confirmation promptly. The resolution of all claims appears to be substantially complete and distribution appears imminent. If Metro's claim is not disallowed as tardily filed, it will be challenged on substantive grounds, preventing prompt distribution and closure of the debtor's estate, and causing the accrual of additional administrative expenses. We believe that these circumstances constitute the type of prejudice that would preclude a finding of excusable neglect under Pioneer.
B. The length of delay and impact upon proceedings:
In this case, Metro failed to file its proof of claim until nearly two years after the court order rejecting Metro's contracts, 22 months after the Rule 26(b) bar date, and seven months after confirmation of debtor's liquidating plan. We compare the delay in Pioneer, where the bar date was missed by twenty days, and in Sacred Heart, where the bar date was missed by four months, but before plan confirmation.
As we have noted, allowance of Metro's claim will most likely delay consummation of the plan, will add to administrative expenses, and will impact substantially upon the pro rata distribution to the unsecured creditors. These factors favor disallowance of the claim.
C. The reason for the delay:
Metro readily acknowledges that it did not file a proof of claim because it believed that filing the proof of claim would be futile. A conscious business decision was made not to file a claim. Metro was not prevented from complying by forces beyond its control. It simply "chose" not to file. The ability to timely file a proof of claim was clearly within Metro's reasonable control.
Metro's reason for the delay in filing a timely proof of claim also disfavors allowing the claim.
D. Good faith:
There is no indication in the record that Metro failed to act in good faith. Metro merely made a business decision not to file a proof of claim. There is no suggestion of any untoward motive on the part of the creditor with regard to the delay.
In sum, notwithstanding the apparent good faith of the creditor, we conclude that the factors here weigh heavily in favor of disallowing Metro's untimely proof of claim. The factors include the need for expeditious distribution of debtor's estate, the prejudice of delay to those unsecured creditors who did file timely, the length of Metro's delay in filing, and the fact that the reason for the delay was simply a conscious business decision by Metro. Metro has failed to establish excusable neglect under Fed.R.Bankr.P. 9006. Metro's motion for allowance of its late filed claim is denied.
Counsel for the movant Metro will prepare an order in conformance with this decision.
NOTES
[1] Antonio Reale holds a 1% interest in the limited partnership as debtor's sole general partner, and an additional 63% interest as a limited partner. The remaining 36% interest in the partnership is divided equally between Joseph Reale and Sara Capobianco.
[2] Debtor's original petition attached as Exhibit A a list of the 20 largest unsecured creditors. Only 10 creditors were listed, and Metro was listed as # 10 with a claim of $350.00. Metro was not included in debtor's Exhibit C, a list of creditors, or on debtor's mailing matrix. Debtor's schedules were filed on July 22, 1992, but Metro was not included in the schedules.
[3] Metro was apparently not served with notice of this bar date.
[4] The Loew proposal would have provided for the acceptance of Metro's executory contract. As part of the sale to GDI, the December 23, 1993 order specifically rejected the executory contracts.
[5] Counsel for Metro was served with notice of the proposed plan and disclosure statement.
[6] On August 14, 1995, we considered Metro's motion for reconsideration, which we subsequently denied by order dated August 21, 1995. On August 24, 1995, Metro appealed the decision dismissing the complaint to the United States District Court, where it is still pending.
[7] Metro's quest for relief against the FDIC on counts of unjust enrichment and imposition of an equitable lien were also denied. No unjust enrichment can be shown where the property was purchased on condition that all leases be rejected, and on condition that the leasing agreement with Metro also be rejected. Nor can unjust enrichment be shown where there was no agreement in place regarding Metro's role as broker for the purchaser. As to movant's request for an equitable lien, it was noted that no post-petition lien was authorized by the court. In terms of pre-petition activities between the parties, as reflected in the leasing agreement, there was no expression of intention that the proceeds of any sale of the property would be designated to serve as security for the obligations thereunder.
[8] Excerpts from the April 25, 1995 hearing reflect the following:

MR. LESSER: . . . [W]e are trying to collect on leasing commissions from the general partner of the debtor, not actually the debtor. But given the fact that there's a substantial likelihood that an issue regarding joinder of the debtor may arise as a required party in the action, we requested that we have relief from stay merely to name them as a party and  but not actually to seek any collection or attach any assets of the debtor.
Tr. p. 3, 1.24 to p. 4, 1.6.
THE COURT: . . . The order that would be issued in connection with your motion will confirm that there is no recovery sought against the debtor; that it is for procedural purposes that the naming of the debtor is sought, if it is necessary; and that your aim is to clarify that you are entitled to proceed with your quest for relief against the general partner; and that's basically it.
Tr. p. 5, 1.10-16.
[9] Oxford Valley Road Associates, L.P. and GDI filed a complaint against Bucks County, et al. in adversary no. 95-1181 to determine the amount and legality of the taxes assessed against debtor's property. The tax delinquency assessed by the taxing authority was $1,911,856.91. The parties consented to a settlement in the amount of $1,635,000.00 on October 2, 1995. Pursuant to debtor's Plan, GDI remitted to the debtor 25% of the savings, or the sum of $69,214.20. Of this amount, $37,974.97 has already been drawn down by Nagel, Rice & Dreifuss, debtor's counsel, pursuant to three prior fee awards approved by the court. $35,235.66 remains available for distribution to unsecured creditors.
[10] Although the FDIC believes that there are unsecured claims in the amount of $188,061.05, Mr. Reale believes that as the result of certain releases and other settlements, the total amount of unsecured claims is $66,438.17.
[11] On November 15, 1995, Metro filed a proof of claim in the amount of $753,018.14 through its non-bankruptcy counsel. By its motions papers filed on December 1, 1995, Metro requests that the court disregard this proof of claim.
[12] On January 2, 1996, debtor moved for an order expunging and/or reducing certain claims against the debtor's estate. Debtor's motion was granted by order dated January 29, 1996. Excluding the proofs of claim filed by Metro, allowed claims now total $65,375.67.
[13] Local R.Bankr.P. 26 provides:

(a) A proof of claim or interest required under Fed.R.Bankr.P. 3003(c)(2) shall be filed within 90 days after the first date set for the meeting of creditors called pursuant to § 341(a) of the Code.
(b) A proof of claim arising from rejection of executory contracts or unexpired leases shall be filed within the later of
(1) 30 days after the date of rejection; or
(2) 90 days after the first date set for the meeting of creditors called pursuant to § 341(a).
[14] At the April 25, 1995 plan confirmation hearing, the following exchange took place:

THE COURT: . . . even though without any votes we would  we might consider the unsecured class to have deemed to reject the plan since it's unlikely that they will receive any dividend, but yet there are affirmative votes in favor of the plan.
MR. PACITTI: Your Honor, there is the plan fund that will be funded from the tax savings as a result of the tax litigation; so there will be a fund available to distribute to unsecured creditors a percentage of the tax savings achieved as a result of that litigation and it's money that actually will be paid into a fund and distributed to creditors.
THE COURT: Yes, I appreciate that notation and my only comment is the prospect that it will reach  meaning that we have some administrative expenses and clearly it's not guaranteed that such a fund will be available; so you're right, there may be some prospect. Okay.
(T14-13 to T15-2).
[15] Bankruptcy Rule of Procedure 3003 provides in relevant part:

(c) Filing Proof of Claim.
(1) Who May File. Any creditor or indenture trustee may file a proof of claim within the time period prescribed by subdivision (c)(3) of this rule.
(2) Who Must File. Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.
(3) Time for Filing. The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed. Notwithstanding the expiration of such time, a proof of claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2), (c)(3), and (c)(4).
[16] See text of Local Bankruptcy Rule 26(b) in footnote 13, supra.
[17] Bankruptcy Rule of Procedure 9006 provides in relevant part:

(b) Enlargement.
(1) In General. Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request made therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.
(2) Enlargement Not Permitted. The court may not enlarge the time for taking action under Rule 1007(d), 1017(b)(3), 2003(a) and (d), 7052, 9023, and 9024.
(3) Enlargement Limited. The court may enlarge the time for taking action under Rules 1006(b)(2), 1017(e), 3002(c), 4003(b), 4004(a), 4007(c), 8002, and 9033, only to the extent and under the conditions stated in those rules.
[18] Notwithstanding this decision, the court indicated that it would also have found that the plaintiff's actions were not "excusable". See id. at 991 n. 5.