**In re ANICOM, INC., et al., Debtors.**

**No. 01 B 00485.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 22, 2002.

---

7. *See* Bankruptcy Code § 1329(a).

John Robert Weiss, Katten Muchin Zavis, Chicago, IL, for Debtors.

James E. Spiotto, Chapman & Cutler, Chicago, IL, for Harris Trust & Savings Bank.

Catherine Steege, Jenner & Block, Kevin Cleary, Fort Dearborn Partners, Inc., Chicago, IL, for Creditors Committee.

Stephen G. Wolfe, Office of the U.S. Trustee, Chicago, IL, for U.S. Trustee.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

Debtors have filed an application for authority to pay compensation and reimbursement of expenses to their crisis manager, Fort Dearborn Partners ("Fort Dearborn"), as well as an application for authority to retain Fort Dearborn "nunc pro tunc" to the filing of the petitions commencing these cases. For the reasons set forth below, the Court denies each of these applications.

### Background

Chapter 11 petitions were filed on January 5, 2001 by Anicom, Inc., a seller and distributor of multimedia technology products, and its wholly owned subsidiary, TW Communications Corp. A committee of unsecured creditors (the "Committee") was appointed on January 11, 2001.

On the date the petitions were filed, the Debtors also filed applications to retain liquidation consultants, Hilco Auction and Appraisal Services, LLC and Hilco Receivables, LLC (collectively, "Hilco"). The Debtors had previously determined that a court-supervised liquidation would be the preferable course for these cases.

On January 22, 2001, seventeen days after the filing of the petitions, Debtors filed their Application for Authority to Retain and Employ Fort Dearborn Partners as Crisis Manager (the "Original Employment Application"), seeking to retain Fort Dearborn for the duration of the Chapter 11 administration. In the Original Employment Application, Debtors asserted that Fort Dearborn's services were "necessary to enable the Debtors to maximize the value of their respective estates during the . . . liquidation process." They further alleged that because of the "necessity of the immediate installation of a crisis manager," Fort Dearborn was under pressure to begin services without prior Court approval. Accordingly, Debtors requested that Fort Dearborn's employment be approved

"nunc pro tunc" to the filing of the Chapter 11 petitions.

Attached to the Original Employment Application was an engagement letter, dated January 3, 2001, setting forth Fort Dearborn's customary hourly rates, ranging from $185 to $385, reciting that the liquidation of inventory and receivables had commenced, and proposing to retain Fort Dearborn as "Restructuring" Consultants (notwithstanding Debtors' liquidation status). The engagement letter also contained a provision limiting Fort Dearborn's liability on the engagement to the amount of fees collected as well as a provision for indemnification of Fort Dearborn by Anicom against all liabilities relating to the engagement except those resulting from gross negligence or bad faith by Fort Dearborn in the rendition of services.

Pursuant to the engagement letter, Debtors paid $50,000 to Fort Dearborn as a retainer prior to the filing of the petitions. Fort Dearborn continues to hold the full amount of that retainer (the "Retainer").

At the initial hearing held January 25, 2001 on the Original Employment Application, the Court inquired of Debtors' counsel why a crisis manager was needed at all in these cases. Counsel responded that he had "fielded that question from a number of people," and sought a continuance to February 1st. Consideration of the Original Employment Application was thereafter continued several more times until the Debtors eventually withdrew it, without prejudice, on February 15, 2001. Fort Dearborn ceased rendering services on or about February 2, 2001.

Several months later, on May 17, 2001, Debtors filed the First and Final Application of Fort Dearborn Partners, Inc. for Allowance of Compensation and Reimbursement of Expenses (the "Fee Application"), seeking $25,194.96 for fees and $472.65 for expenses for services provided prior to the withdrawal of the Original Employment Application, from January 5, 2001, the date of the petitions, through February 2, 2001. Debtors again state in the Fee Application that the "pressure" to begin services without Court approval was based in part on the need for a . crisis manager early in these cases as well as on significant reductions in the workforce of the Debtors' accounting and finance sectors. Debtors sought allowance of the fees and expenses despite the failure to obtain Court approval.

The United States Trustee filed an objection to the Fee Application, contending that Fort Dearborn is ineligible for compensation because of its failure to obtain Court approval for its employment under § 327 of the Bankruptcy Code. The Fee Application also met resistance from the Committee.

In an effort to resolve these objections, Debtors filed on July 2, 2001 a new application to retain Fort Dearborn as crisis manager (the "Second Employment Application"), again seeking employment "nunc pro tunc"[1] to the filing of the Chapter 11 petitions. Debtors asserted that a "nunc pro tunc" order should be entered because the Debtors had received valuable services and it would be inequitable for the estates to retain the value of such services without compensation.

---

[1]. Fort Dearborn characterized its request as one for "nunc pro tunc" approval. As noted in *Singson,* that term literally means "now for then" and has reference to situations in which a court's record is corrected to accurately reflect its actions. *Singson,* 41 F.3d at 318. In this case, however, what Fort Dearborn seeks, as in *Singson,* is a "brand new substantive decision." *Id.* at 319.

At the hearing on the Second Employment Application held on September 6, 2001, Debtor's counsel acknowledged that the Original Employment Application had met serious resistance from the Committee but proposed nonetheless that the Second Employment Application be allowed based on the alleged value of Fort Dearborn's services to the estate and the "excusable neglect" in failing to formally retain Fort Dearborn as crisis manager.

The United States Trustee objected, contending that the "excusable neglect" standard was not met, inasmuch as an application to retain Fort Dearborn *had* in fact been filed, but was later withdrawn (i.e., the Original Employment Application). He added, however, that if Debtors' secured lenders were willing to provide the funds for payment to Fort Dearborn without adding that amount on to their deficiency claim, the United States Trustee would have no objection.

The request for fees and for retroactive retention was also opposed by the Committee at the September 6, 2001 hearing. Counsel for the Committee stated that she had made it clear from the beginning of the case that since the Debtors were liquidating, a crisis manager was inappropriate. Further, she stated that no one in the case had ever really been informed as to what Fort Dearborn was doing or why they were doing it. She also contended that retroactive retention and payment would be highly prejudicial to the rights of unsecured creditors, as the payment would have to come from the secured lenders' cash collateral, and the lenders were unwilling to forego their right to seek "superpriority" status for such a payment under § 507(b) of the Bankruptcy Code.[2] Although counsel for the secured lenders stated that he did not object to the payment, he confirmed that the secured lenders would insist upon a reservation of rights.

The Court inquired of Debtors' counsel what he believed constituted the "excusable neglect" warranting a retroactive employment order in this case. Debtors' counsel could not really articulate a response, other than to allude to the fact that he had not pressed the Original Employment Application but had "kept on pushing it to try to work out some kind of deal" and then finally "dropped it" when Fort Dearborn stopped providing services. The Court also inquired as to the nature of the work performed, and counsel stated that Fort Dearborn had "acclimat[ed] the Anicom accounting professionals to, you know, the liquidation process."[3] When asked how that was accomplished, counsel indicated that he could not really specify,—not being an accountant himself,—and would need a representative of Fort Dearborn to provide the explanation.

**2.** § 507(b) of the Bankruptcy Code provides a special priority for claims resulting from the failure of adequate protection. It states:

If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

**3.** In the Second Employment Application, counsel further states that Fort Dearborn conducted "significant" financial analyses associated with use of cash collateral budgets and cash flow activity, at a time when Debtor's reduced workforce required the expertise of a seasoned crisis manager.

*Discussion.*

■ Section 327 of the Bankruptcy Code provides in relevant part as follows:

> (a) ... [T]he trustee, *with the court's approval,* may employ one or more attorneys, accountants, appraiser, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

(Emphasis added) Accordingly, in order for a trustee (and therefore a Chapter 11 debtor in possession)[4] to employ attorneys and other professionals, court approval is required.

■ Section 330 of the Bankruptcy Code provides in relevant part as follows:

> (a) (1) After notice to the parties in interest and the United States Trustee and a hearing, ..., the court may award to a trustee, an examiner, *a professional person employed under section 327* or 1103—
>
>> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
>>
>> (B) reimbursement for actual, necessary expenses.

(Emphasis added) Accordingly, in order for a professional person to be eligible for payment of fees and expenses, he must first be retained under § 327 of the Bankruptcy Code,[5] which in turn requires court approval.

■ Neither § 327 nor the rule implementing that provision[6] expressly requires that court approval precede the rendition of services. *See In re Singson,* 41 F.3d 316, 319 (7th Cir.1994). However, prior court approval is "strongly preferred because it permits close supervision of the administration of an estate, wards off 'volunteers' attracted to the kitty, and avoids duplication of effort." *Id.* The courts have therefore required that court approval precede the rendition of services as a matter of sound judicial administration.

■ In the Seventh Circuit, under *Singson,* the requirement of prior court approval is literally "read into Rule 2014(a) (and § 327)." *Singson,* 41 F.3d at 320. The Court in *Singson* further explained that when a court "implies a requirement as part of a rule, it ought to use the ancillary procedures that govern when the requirement appears expressly." *Id.* Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") governs extensions of time for acts "required or allowed to be done at or within a specified time by [the Bankruptcy Rules] or by a notice given thereunder or by order of court." The Court in *Singson,* having literally read the requirement of prior court approval into Rule 2014(a), held the provisions of Bankruptcy Rule 9006(b)(1) applicable in determining whether a belated request for employment should be granted. The standard set forth in Rule 9006(b)(1) is "excusable neglect," and that is accordingly the standard to be applied to such a request in the Seventh Circuit.

---

4. Pursuant to § 1107(a) of the Bankruptcy Code, a debtor in possession in Chapter 11 generally has all the rights and powers of a trustee.

5. As indicated above but not applicable here, employment may also be authorized under § 1103, which provides for retention of professionals by a creditors' committee.

6. Fed.R.Bankr.P. 2014.

■ Before applying the excusable neglect standard to the facts of this case, however, it should be noted that the Court arguably need not even reach the timeliness issue. A two-part analysis must be employed in ruling on applications for retroactive employment approval. First, a determination must be made whether the applicant would have been approved upon a timely request, and then a determination is made as to the sufficiency of the excuse for delay. Here, it is doubtful that Fort Dearborn would have been approved in the first instance. At the initial hearing on the Original Employment Application, the Court expressed concern as to the need for a crisis manager in this case, which has been in the liquidation mode since its commencement. As admitted by Debtors' counsel, parties in interest had also communicated concerns prior to the hearing. As a result, counsel requested that the hearing be postponed, and after several continuances, the application was withdrawn.

■ Even assuming, however, that the Court would have allowed the Original Employment Application had it not been withdrawn, Debtors have nonetheless failed to establish the requisite "excusable neglect." The Supreme Court, in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), outlined the parameters of excusable neglect, explaining:

> There is, of course, a range of possible explanations for a party's failure to comply with a court-ordered filing deadline. At one end of the spectrum, a party may be prevented from complying by forces beyond its control, such as by an act of God or unforeseeable human intervention. At the other, a party simply may choose to flout a deadline. In between lie cases where a party may *choose* to miss a deadline although for a very good reason, such as to render first aid to an accident victim discovered on the way to the courthouse, as well as cases where a party misses a deadline through inadvertence, miscalculation, or negligence.

*Id.* at 387–88, 113 S.Ct. 1489 (emphasis in original) In *Pioneer*, which involved a late-filed proof of claim, the Supreme Court overruled cases under Bankruptcy Rule 9006(b)(1) that had limited "excusable neglect" to situations where late filings were caused by circumstances beyond the party's control. The Court held that "neglect" includes carelessness; indeed, the Court stated that "to exclude every instance of an inadvertent or negligent omission would ignore the most natural meaning of the word 'neglect'...." *Id.* at 394–95, 113 S.Ct. 1489.

■ As to the second requirement,—that the neglect be "excusable,"—the Court held

> the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395, 113 S.Ct. 1489.

In this case, Fort Dearborn has arguably not even established "neglect," much less "excusable neglect." The failure to obtain prior approval for Fort Dearborn's engagement was not the result of an inadvertent or negligent omission. In fact, the Original Employment Application was filed only seventeen days after the Chapter 11 petitions. Counsel attempted to argue excusable neglect by suggesting that he "dropped" the Original Employment Appli-

cation when Fort Dearborn ceased performing services, after counsel's unsuccessful attempts to try to negotiate "some kind of deal." However, it is clear that Debtors' counsel made a conscious and deliberate choice to withdraw the application, which had met resistance by both the Committee and other parties in interest.

■ Although there may be instances where a late filing resulting from deliberate action nonetheless constitutes "neglect,"—*e.g.*, the situation described in *Pioneer*, where a party *chooses* to miss a deadline for the "very good reason" that he will render first aid to an accident victim discovered on the way to the courthouse, *id.* at 388, 113 S.Ct. 1489,—conscious and deliberate action rarely constitutes excusable neglect. *See, e.g., In re Celotex Corp.*, 232 B.R. 493 (M.D.Fla. 1999), *aff'd sub nom. Sunset Vine Tower v. Celotex Corp.*, 196 F.3d 1262 (11th Cir. 1999) (deliberate decision not to file timely proof of claim because of doubts about evidentiary basis therefor); *Agribank v. Green*, 188 B.R. 982, 989 (C.D.Ill.1995) (intentional deferral of filing proof of claim until liquidation of exact amount after closing of state court foreclosure sale); *In re LAN Assocs. XIV, L.P.*, 193 B.R. 730, 737 (Bankr.D.N.J.1996) (conscious decision not to file timely proof of claim because it appeared that such filing would be futile). Where deadlines are missed based on conscious and deliberate decisions, the reasons are rarely "very good" ones, as in the *Pioneer* example, but are ordinarily calculated and strategic choices or decisions based on honest but unsound business judgment. On the spectrum of justifications for delay posed by the Supreme Court in *Pioneer*, ranging from forces beyond one's control to simple "flouting" of a deadline, these situations are much closer to the flouting end.

In this case, the Original Employment Application was intentionally withdrawn because it met with resistance from parties in interest, who considered Fort Dearborn's engagement to be ill-advised and unnecessary, and Fort Dearborn (no doubt as a result thereof) ceased performing services soon after the initial hearing. The fact that the application was withdrawn because of the unlikelihood of Court approval places Fort Dearborn at the far end of the spectrum, disfavoring a reprieve under Bankruptcy Rule 9006.

As for the other factors that the Court must, under *Pioneer*, consider in determining whether neglect is excusable, it should be noted that the length of the delay in filing the Second Employment Application was nearly six months. Arguably, however, the delay has little impact on the administration of these estates. The remaining two factors,—good faith and the danger of prejudice to Debtors,— are not unfavorable to Fort Dearborn. No one has suggested that it acted in bad faith in failing to obtain prior Court approval, and there is little danger that the delay has caused any significant prejudice to Debtors.[7]

Again, however, the final factor—the reason for the delay in seeking Court approval and whether it was within the applicant's reasonable control,—compels the Court's conclusion that the "neglect" in this case, if any, is not of the "excusable" kind. The intentional withdrawal of the Original Employment Application was completely within Fort Dearborn's control, and the ultimate reason for the withdrawal

---

7. The Court notes, *inter alia*, that no plan is yet on file. In addition, the Court does not believe that the prejudice suggested by counsel for the Committee (a potential claim by Debtors' secured lenders of superpriority status under § 507(b)) can be characterized as the result of the delay at issue here.

was the likely denial of Court approval in any event. Under these circumstances, the applicant's request for retroactive approval must be denied.

 This decision also disposes of Fort Dearborn's claim for fees and expenses. In both *Singson* and *In re Milwaukee Engraving Co., Inc.*, 219 F.3d 635 (7th Cir.2000), *cert. denied sub nom., Maier, McIlnay & Kerkman, Ltd. v. Bodenstein,* 531 U.S. 1112, 121 S.Ct. 856, 148 L.Ed.2d 770 (2001), the Court held that a professional may not be compensated for services where its application for approval of employment has been denied. In *Milwaukee Engraving,* the bankruptcy court (affirmed by the district court) had allowed such a fee application based on § 503(b)(1)(A) of the Bankruptcy Code, because the attorney's services were beneficial and it would be inequitable to deny compensation therefor. The Seventh Circuit reversed, explaining:

> [T]he structure of § 503(b) strongly implies that professionals eligible for compensation must receive it under § 503(b)(2)—which depends on authorization under § 330 ... (and thus on approval under § 327). One might as well erase § 503(b)(2) from the statute if attorneys may stake their claims under § 503(b)(1)(A) even when ineligible under §§ 327, 330, and 503(b)(2).[8]

*Id.* at 637.

Accordingly, as Fort Dearborn's application for employment has been denied, its Fee Application must likewise be denied and the Retainer ordered returned. The Court further notes that even if this result were not required by statute, Fort Dearborn failed to meet its burden with respect to the value of services performed in this case.

---

8. Section 503(b)(2) provides for allowance of administrative expense status for "compensa-

## CONCLUSION

For the reasons stated above, the Application for Authority to Retain and Employ Fort Dearborn Partners as Crisis Manager *Nunc Pro Tunc* to the Petition Date and the First and Final Application of Fort Dearborn Partners, Inc. for Allowance of Compensation and Reimbursement of Expenses will each be denied, and the Retainer ordered immediately returned to Debtors.

tion and reimbursement awarded under section 330(a)."